United States District Court

For the Northern District of California

1

2

3

4

IN THE UNITED STATES DISTRICT COURT

5

FOR THE NORTHERN DISTRICT OF CALIFORNIA

6

7
In re INTRABIOTICS PHARMACEUTICALS,
INC. SECURITIES LITIGATION,

No. C 04-02675 JSW

8

**CLASS ACTION**

9

10
This document relates to:

11
    All Actions

12

13

14

**ORDER (1) GRANTING IN PART
AND DENYING IN PART
DEFENDANTS' MOTION TO
DISMISS CORRECTED
CONSOLIDATED AMENDED
COMPLAINT AND (2) DENYING
DEFENDANTS' MOTION TO
REQUIRE UNDERTAKING**

_____/

15

## I.  INTRODUCTION

16
        Lead plaintiff Jack Kindregan ("Kindregan") and representative plaintiffs Del F. La

17
Follette ("Follette") and John Buche ("Buche") (collectively "Plaintiffs") bring this action

18
individually and on behalf of all other persons who purchased or otherwise acquired the

19
common stock of defendant IntraBiotics Pharmaceuticals, Inc. ("IntraBiotics") between

20
September 5, 2003 and June 22, 2204 (the "Class Period"),[1] pursuant to Sections 10(b) and

21
20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78t(a), and the rules and

22
regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. 240.10b-5.  Plaintiffs

23
further bring claims on behalf of Buche and persons who purchased IntraBiotics' stock on or

24
around May 5, 2004, pursuant to Sections 11 and 15 of the Securities Exchange Act of 1934, 15

25
U.S.C. §§ 77k and 77o.

26
        Now before the Court is the motion to dismiss the Corrected Consolidated Amended

27
Class Action Complaint ("Complaint") filed by defendants IntraBiotics, Henry J. Fuchs

28

---

        [1]    The Court has not yet certified a class and refers to the time period involved as
the "Class Period" for ease of reference.

("Fuchs"), Detlef Albrecht ("Albrecht"), David J. Tucker ("Tucker"), Ernest Mario ("Mario"), Kevin C. Tang ("Tang"), Mark L. Perry ("Perry"), Gary A. Lyons ("Lyons"), Jerry Jackson ("Jackson") and Jack S. Remington ("Remington") (collectively "Defendants").[2]  Defendants move to dismiss asserting that Plaintiffs fail to meet the heightened pleading requirements of the Private Securities Litigation Reform Act ("PSLRA") and fail to state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6).  Defendants further assert that further amendments to the Complaint would be futile and request that the Court dismiss this action with prejudice.  Also before the Court is Defendants' motion to require an undertaking pursuant to 15 U.S.C. § 77k(e) (Section 11(e) of the Securities Exchange Act of 1934).

Having carefully reviewed the parties' papers, considered their arguments and relevant legal authority, and having had the benefit of oral argument, the Court hereby GRANTS IN PART and DENIES IN PART Defendants' motion to dismiss.  The Court GRANTS Plaintiffs leave to amend the dismissed claims.  The Court DENIES Defendants' motion to require an undertaking.

## II.  FACTUAL BACKGROUND

IntraBiotics is a publicly traded biopharmaceutical company founded in 1994.  (Compl. ¶ 2.)  During the relevant Class Period, IntraBiotics' sole advanced drug candidate was iseganan hydrochloride ("iseganan").  Defendant Fuchs is IntraBiotics' Chief Executive Officer and has served as a member of IntraBiotics' Board of Directors since November 2001.  Defendants Albrecht, Tucker, Mario, Tang, Perry, Lyons, Jackson, and Remington are all officers and/or directors of IntraBiotics.  (*Id.* at ¶¶ 21-28.)

### Testing of Iseganan for Oral Mucositis

Prior to the Class Period, IntraBiotics tried but failed to bring iseganan to the market for the treatment of oral mucositis, a common debilitating side effect of cancer therapy that is characterized by severe mouth ulcers that often become infected.  (*Id.* at ¶ 3.)  IntraBiotics' first

---

[2]    After Defendants filed a motion to dismiss the consolidated amended complaint, Plaintiffs sought and were granted leave to file a corrected consolidated amended complaint.  The parties agreed that the pending motion was applicable to the corrected consolidated amended complaint.

United States District Court

For the Northern District of California

Phase III trial tested iseganan on cancer patients undergoing chemotherapy.  (*Id*. at ¶ 50.)
According to confidential witnesses who are former IntraBiotics' employees, including a
research scientist, the Vice President of Program Management, and the Vice President of
Business Operations, "Fuchs violated clinical trial protocol and secretly fixed the data in this
trial to indicate a positive trend for [iseganan] to justify continuing the trial.  (*Id*.)  On April 26,
2001, IntraBiotics announced that iseganan "did not meet its primary endpoint of reducing
ulceration, but did meet its secondary endpoint of reducing pain and was well tolerated."
However, IntraBiotics discounted these results due to a subcontractor's error in assigning
iseganan or the placebo to 102 patients.  (*Id*. at ¶ 51.)  This error obscured Fuchs' manipulation
of the data.  (*Id*.)

IntraBiotics conducted another Phase III trial of iseganan for the treatment of oral
mucositis on cancer patients receiving radiation therapy. (*Id*. at ¶ 53.)  On May 3, 2002,
IntraBiotics announced the results from this Phase III trial, stating that the "trial showed no
difference between iseganan and placebo in the primary or secondary endpoints." (*Id*.)
According to a confidential witness who was a project manager at Pharmanet, the contract
research organization for IntraBiotics during the oral mucositis trials, and was familiar with the
results of these trials, iseganan was not a good product because it had a poor taste and added to
the nausea of the patients who tried it.  (*Id*. at ¶¶ 51, 54.)  On September 27, 2002, Mario
announced that the preliminary test results from the trial "indicated that iseganan did not meet
its primary endpoint of reducing oral mucositis," and thus, IntraBiotics ceased pursuing
iseganan to treat this disease.  (*Id*. at ¶ 55.)

### Testing of Iseganan for Ventilator-Associated Pneumonia

By the beginning of the Class Period, "the fate of IntraBiotics hinged on the success of
iseganan" in Phase III clinical trials for the prevention of ventilator-associated pneumonia
("VAP"), a bacterial pneumonia that can develop in patients receiving mechanical or artificial
ventilation.  (*Id*. at ¶ 4.)

On December 8, 2000, IntraBiotics commented that a Phase I trial of iseganan for the
treatment of VAP showed that the drug was well-tolerated and reduced the amount of bacteria in

*United States District Court*

For the Northern District of California

1    patients' mouths and throats, and announced that it began patient enrollment for a Phase IIa trial

2    of iseganan for VAP. (*Id*. at ¶ 57.) In March 2001, IntraBiotics announced that the data from

3    the Phase IIa trial indicated that iseganan was well-tolerated and demonstrated antimicrobial

4    activity when administered to patients at risk for developing VAP. (*Id*. at ¶ 58.)

5        On February 6, 2003, Intrabiotics issued a press release announcing its launch of a Phase

6    II/III trial of iseganan for the treatment of VAP and stated, in pertinent part: "[Intrabiotics]

7    recently concluded a productive meeting with the Food and Drug Administration to discuss the

8    development of iseganan for VAP. ... [I]seganan has been shown to be well tolerated in clinical

9    studies in cancer patients, and to effect significant reductions in the level of bacteria in the oral

10   cavity of cancer patients as well as patients who require artificial ventilation." (*Id*. at ¶ 59.)

11       In connection with its Phase II/III for VAP, Defendants established an independent

12   drug safety monitoring board ("DSMB"). The DSMB received the interim results of the trials,

13   which were double-blinded. The DSMB then "unblinded" the results and met monthly to

14   discuss the results. (*Id*. at ¶ 60.) According to a confidential witness who worked as a vice

15   president of biostatistics at Pharmanet, if the clinical investigators perceived any problems with

16   iseganan during the clinical trials, that information would be summarized for the DSMB, and

17   IntraBiotics would be notified of the overall toxicity profile of the problem. (*Id*.)

18       On September 5, 2003, the start of the Class Period, IntraBiotics issued a press release

19   stating that Food and Drug Administration ("FDA") granted fast track designation for the

20   development of iseganan for treating VAP, and that IntraBiotics previously had completed and

21   announced results of a Phase I/II study of the safety and efficacy of iseganan administered to

22   mechanically ventilated patients. (*Id*. at ¶ 62.) In the press release, IntraBiotics stated:

23           Designation as a fast track drug indicates that the FDA will facilitate the
         development and expedite the review of a new drug that is intended to treat a serious or
24       life-threatening condition and that demonstrates the potential to address an unmet
         medical need. In a letter to the company, the FDA stated: "We are granting fast track
25       designation for the following reasons:
             There are currently no products approved (topical or systematic) for the
26       prevention of ventilatory-associated pneumonia.
             Ventilator-associated pneumonia is commonly recognized as a highly morbid
27       condition in critically ill patients. Prevention of this disorder is desirable."
             ... "VAP is a devastating complication experienced by critically ill patients who
28       are vulnerable to infection because of the requirement for artificial ventilation," said Dr.
         Marin Kollef, Associate Professor of Medicine at Washington University School of

United States District Court

For the Northern District of California

Medicine, Pulmonary and Critical Care Division in St. Louis. "Experts have long believed that pneumonia in patients should be preventable through the use of antibiotic decontamination of the mouth, but so far we have lacked the appropriate antibiotic - one that can be safely applied into the mouth and not worsen problems of antibiotic resistance.  This approach has become more important as bacterial resistance to antibiotics continues to grow and the development of new antibiotics to cope with resistance has lagged. Because of iseganan's properties, VAP represents a logical an important potential application.  We look forward to the results of the upcoming pivotal clinical trials."

... "We are pleased to be working with the FDA to finalize the protocol for [the upcoming Phase II/III trial] because of the FDA's expertise in trial design and review. We believe that patients with VAP will benefit from FDA input by virtue of assuring that the collected data will support expeditious product registration if the trials are successful," said Dr. Henry Fuchs, President and CEO of IntraBiotics.

(*Id.*)[3]

IntraBiotics announced it had reached a Special Protocol Agreement ("SPA") with the FDA in a press release issued on September 19, 2003.  In the press release, IntraBiotics stated: "We have appreciated our collaboration with the FDA throughout the SPA process on this development program, which has been designed to address an unmet medical need for mechanically-ventilated patients who are at high risk for developing VAP. ... Agreement with the FDA on the design of these clinical trials is important to assure expeditious registration if the trials are successful."  (*Id.* at ¶ 65.)[4]

Plaintiffs allege that the statements in the press releases issued in September 2003 were materially false and misleading because Defendants had no intention of complying with the protocol for the trials that they were developing with the FDA to test iseganan, which included FDA regulations and guidelines regarding monitoring and reporting adverse effects to the FDA, and because Defendants failed to disclose that iseganan caused increased nausea in previous trials.  (*Id.* at ¶¶ 64, 67.)

---

[3]  At the hearing on Defendants' motion to dismiss, Plaintiffs clarified that they contend the following two statements in the September 5, 2003 press release were false: "[Iseganan] demonstrates the potential to address an unmet medical need" and "Because of iseganan's properties, VAP represents a logical an important potential application."

[4]  At the hearing on Defendants' motion to dismiss, Plaintiffs clarified that they contend the following statement in the September 19, 2003 press release was false: "Agreement with the FDA on the design of these clinical trials is important to assure expeditious registration if the trials are successful."

United States District Court

For the Northern District of California

IntraBiotics planned to enroll approximately 900 patents in the Phase II/III trial for VAP. The patients in the trial were given either iseganan or a placebo six times a day for up to fourteen days while they were mechanically ventilated.  (*Id*. at ¶ 68.)  Plaintiffs allege:

> Based on a 14-day cycle per patient, test results (i.e., the raw data) were available within two weeks of the commencement of the trials.  Any adverse effects of iseganan on the tested patients, such as, for example, death or increased illness as opposed to improvement from using the drug, would be apparent at that point.  Similarly, a comparison of the results of the tests on patients taking iseganan versus those taking a placebo would be available as of 14 days into the start of the trials.

(*Id*.)

On October 7, 2003, IntraBiotics issued a press release announcing that it had enrolled the first patients in its first Phase II/III trial for VAP.  In particular Fuchs stated: "we look forward to working closely with our clinical investigators to expedite the development of iseganan for the prevention of VAP...."  (*Id*. at ¶ 70.)  On October 29, 2003, IntraBiotics stated in a press release that it had "achieved a series of milestones over the last three months which have significantly strengthened and repositioned [IntraBiotics] for future growth[.] ... Our novel lead product, iseganan, is now in late-stage pivotal clinical trials.  Assuming successful completion of these trials, iseganan has a clear path to registration for the prevention of VAP, a major unmet medical need worldwide. ... Iseganan may also have potential applications for a variety of other infections that we will begin to explore in the near future."  (*Id*. at ¶ 72.)

On February 12, 2004, IntraBiotics announced in a press release that its ongoing Phase II/III trial for VAP had been accepted for inclusion in the FDA's Continuous Marketing Application ("CMA") Pilot 2 Program.  Iseganan was the only Fast Track product selected by the Center for Drug Evaluation and Research division of Anti-Infective Drug Products.  In response, Fuchs stated: "We are honored to have been selected for inclusion into this exclusive and pioneering program.  Our selection builds on iseganan's Fast Track status and [SPA] agreement to potentially further speed and clarify the pathway to approval for this agent for VAP ...."  IntraBiotics further stated: "The first of two planned pivotal trials is now well underway to evaluate iseganan oral solution for the prevention of VAP ... and data is expected by the end of this year.  A completed Phase I/II trial in mechanically-ventilated patients

United States District Court

For the Northern District of California

1    demonstrated that iseganan was well tolerated, safe, and effective in decreasing the amount of

2    bacteria and yeast in the mouths of these patients."  (*Id*. at ¶¶ 74, 75.)

3         On March 4, 2004, IntraBiotics announced in a press release that it had already enrolled

4    450 patients in its Phase II/III trial for VAP and stated:  "We have made significant progress in

5    2003, advancing our product candidate, [iseganan], and defining a clear pathway to registration

6    in the United states for a large unmet medical need...."  (*Id*. at ¶ 78.)  In an amended registration

7    statement filed with Securities and Exchange Commission on April 22, 2004 (the "Registration

8    Statement"), IntraBiotics further stated:  "We believe that there are four features of iseganan that

9    will translate into important clinical benefits. ... Based on our experience to date, iseganan

10   appears to be safe and well-tolerated at therapeutically relevant doses when administered to the

11   oral cavity, the planned route of administration for the prevention of VAP.  In particular,

12   iseganan has been delivered to the oral cavity of more than 800 patients to date, with no

13   differences in adverse events between the active and placebo groups observed consistently

14   among the trials."  (*Id*. at ¶ 80.)

15        Plaintiffs allege that the statements alleged in paragraphs 72, 74, 75, 78, and 80 of the

16   Complaint were materially false and misleading because by the time such statements were

17   made, Defendants had access to the interim results of the Phase II/III trial for VAP, which were

18   based on a fourteen-day cycle per patient, and that as a result of such access, Defendants knew

19   or should have known that iseganan was not safe or well-tolerated.  Plaintiffs also allege that

20   such statements were materially false and misleading because Defendants did not intend to

21   comply with, and were in violation of, their obligation to report adverse results to the FDA.  (*Id*.

22   at ¶¶ 73, 77, 79, and 82.)

23        On May 5, 2005, Defendants raised approximately $36.1 million in a public offering,

24   and then raised an additional $6.1 million around June 3, 2004, when they announced that the

25   underwriters of their public offering would exercise their option to purchase an additional

26   450,000 shares to cover over-allotments.  (*Id*. at ¶¶ 7, 83, 84, 90.)  Plaintiffs further allege that at

27   the time of the May 5, 2004 public offering and the June 3, 2004 over-allotment exercise:

28        [D]efendants were aware through their monitoring of the clinical trials that iseganan as a
         treatment for VAP posed serious safety risks, including death.  Defendants were aware

7

1   of the risks because IntraBiotics received the interim results, was responsible for
2   monitoring the testing for, in particular, negative side effects and was informed when
    adverse events occurred.  In particular, [D]efendants were aware of the adverse results
3   by their receipt of the interim results from Robert Ott of Advance Clinical Trials, Inc.
    ("ACT"), a contract research organization hired by [D]efendants to assist in the
4   management and monitoring of the Phase II/III trial.  Mr. Ott was ACT's Project
    Manager of U.S. Operations throughout the duration of IntraBiotic's (sic) Phase II/III
5   clinical trial of iseganan for the prevention of VAP and received interim data from
    testing sites, data which, whether blinded or unblinded, would have indicated an increase
6   of serious adverse events in the patients enrolled in the trial.  Furthermore, the trial
    involved a 14-day cycle per patient, and by the time of the offering and the over-
7   allotment, the clinical trial had enrolled more than 450 patients.  Thus, it had long been
    the case that a statistically significant number of patients had been tested for the data to
8   reliably indicate that there were serious negative side effects to the use of iseganan for
    the treatment of VAP.

9   (*Id.* at ¶ 91.)

10          The $42.2 million Defendants raised through the public offering and over-allotment

11  exercise on May 5, 2004 and June 3, 2004 enabled Defendants to dramatically reduce the

12  negative impact the disclosure of the failure of IntraBiotics' sole drug candidate, iseganan,

13  would have on IntraBiotics' future.  The cash provided IntraBiotics with prospects, including

14  providing Defendants with means to make acquisitions, in-license another drug candidate or

15  make IntraBiotics a more attractive acquisition candidate.  Plaintiffs allege that without this

16  cash, Defendants knew that IntraBiotics would have no drug candidate and no prospects

17  following the failure of the VAP trials, and that they would lose their jobs and be forced to

18  liquidate the company.  (*Id.* at ¶¶ 7, 106.)

19          On June 23, 2004, IntraBiotics announced it had to immediately discontinue the VAP

20  trials based on interim analysis of the data.  (*Id.* at ¶¶ 8, 93.)  The data revealed that a higher rate

21  of VAP and of mortality was observed to the patients who were administered iseganan.  (*Id.* at ¶

22  8.)

23                              **III.  ANALYSIS**

24          Plaintiffs allege that throughout the Class Period Defendants publicly made positive

25  statements concerning iseganan and the progress of the Phase II/III trial for VAP despite their

26  knowledge that patients did not tolerate the drug well and that the trial was indicating adverse

27  results.  Plaintiffs also allege that Defendants engaged in a scheme to raise millions of dollars to

28  provide Defendants with the means to retain their jobs and avoid liquidation.  (Compl. ¶¶ 6-7,

35, 106.)  Section 10(b) of the Securities Exchange Act provides, in part, that it is unlawful "to use or employ in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe."  15 U.S.C. § 78j(b).

Rule 10b-5 makes it unlawful for any person to use interstate commerce:

(a)   To employ any device, scheme, or artifice to defraud;
(b)   To make any untrue statement of material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or;
(c)   To engage in any act, practice, or course of business that operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

To plead a claim under section 10(b) and Rule 10b-5, a plaintiff must allege (1) a misrepresentation or omission, (2) of material fact, (3) made with scienter, (4) on which the plaintiff justifiably relied, (5) that proximately caused the alleged loss.  *Binder v. Gillespie*, 184 F.3d 1059, 1063 (9th Cir. 1999).  Additionally, as in all actions alleging fraud, a plaintiff must state with particularity the circumstances constituting fraud.  *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 193 (9th Cir. 1999); Fed. R. Civ. P. 9(b).

Plaintiffs also claim that individual defendants are liable pursuant to Section 20(a) of the Securities Exchange Act, which provides for derivative liability for those who control others found to be primarily liable under the provisions of that act.  *See In re Ramp Networks, Inc. Sec. Lit.*, 201 F. Supp. 2d 1051, 1063 (N.D. Cal. 2002).  Where a plaintiff asserts a Section 20(a) claim based on an underlying violation of section 10(b), the pleading requirements for both violations are the same.  *Id.*

Finally, Plaintiffs bring claims under Sections 11 and 15 of the Securities Exchange Act as well.  Section 11 imposes liability for false statements or omissions of material fact made in registration statements.  15 U.S.C. § 77k.  To state a claim under Section 11, a plaintiff must allege: "(1) that the registration statement contained an omission or misrepresentation, and (2) that the omission or misrepresentation was material, that is, it would have misled a reasonable

United States District Court

For the Northern District of California

**United States District Court**

For the Northern District of California

1  investor about the nature of his or her investment." *Kaplan v. Rose*, 49 F.3d 1363, 1371 (9th

2  Cir.1994). Scienter is not required "for liability under § 11; defendants will be liable for

3  innocent or negligent material misstatements or omissions." *Id*. However, a plaintiff who seeks

4  to bring a Section 11 claim faces an additional hurdle; purchasers of stock only have standing to

5  sue if they can trace their shares to an allegedly misleading statement. *Hertzberg v. Dignity*

6  *Partners, Inc.*, 191 F.3d 1076, 1081 (9th Cir. 1999); *see also In re SeeBeyond Technologies*

7  *Corp. Securities Litigation*, 266 F. Supp. 2d 1150, 1171 (C.D. Cal. 2003). Section 15 imposes

8  joint and several liability upon every person who controls any person liable under Sections 11 or

9  12. *See* 15 U.S.C. § 77o; *see also In re Daou Systems, Inc.*, 411 F.3d 1006, 1029 (9th Cir.

10  2005).

11  **A.      Applicable Pleading Standards.**

12       **1.      Rule 12(b)(6).**

13       A motion to dismiss is proper under Rule 12(b)(6) where the pleadings fail to state a

14  claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). A motion to dismiss should

15  not be granted unless it appears beyond a doubt that a plaintiff can show no set of facts

16  supporting his or her claim. *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); *see also De La Cruz*

17  *v. Tormey*, 582 F.2d 45, 48 (9th Cir. 1978).

18       **2.      Private Securities Litigation Reform Act.**

19       In order to limit the number of frivolous private securities lawsuits, Congress enacted the

20  PSLRA in December of 1995, and created heightened pleading standards for such lawsuits. 15

21  U.S.C. § 78u-4(b). The PSLRA requires that "the complaint shall specify each statement

22  alleged to have been misleading, the reason or reasons why the statement is misleading, and, if

23  an allegation regarding the statement is made on information and belief, the complaint shall

24  state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1)(B).

25  Furthermore, the PSLRA requires that the plaintiff "state with particularity facts giving rise to a

26  strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-

27  4(b)(2).

28

United States District Court

For the Northern District of California

1    The heightened standard set by the PSLRA was intended to put an end to securities fraud

2    lawsuits that plead "fraud by hindsight." *In re Silicon Graphics, Inc. Sec. Lit.*, 183 F.3d 970,

3    988 (9th Cir. 1999). "The PSLRA significantly altered pleading requirements in private

4    securities fraud litigation by requiring that a complaint plead with particularity both falsity *and*

5    scienter." *In re Vantive Corp. Sec. Lit.*, 283 F.3d 1079, 1084 (9th Cir. 2002) (citing *Ronconi v.*

6    *Larkin*, 253 F.3d 423, 429 (9th Cir. 2001)) (emphasis added). "Thus the complaint must allege

7    that the defendant made false or misleading statements either intentionally or with deliberate

8    recklessness or, if the challenged representation is a forward looking statement, with 'actual

9    knowledge . . . that the statement was false or misleading.'" *Id.* at 1085 (citing 15 U.S.C. § 78u-

10    5(c)(1)(B)(I)). This is often accomplished "by pointing to inconsistent contemporaneous

11    statements or information (such as internal reports) made by or available to the defendants."

12    *Yourish v. California Amplifier*, 191 F.3d 983, 993 (9th Cir. 1999) (quoting *In re GlenFed Sec.*

13    *Lit.*, 42 F.3d 1541, 1549 (9th Cir. 1991) (*en banc*)); *see also id.* at 994 (discussing insufficiency

14    of plaintiffs' allegations with regard to the non-disclosure of confidential non-public

15    information).

16    Under the PSLRA, a complaint still is construed in the light most favorable to the non-

17    moving party and all material allegations in the complaint are taken to be true. *Silicon*

18    *Graphics*, 183 F.3d at 983. To determine whether a plaintiff has pled a strong inference of

19    scienter, however, "the court must consider all reasonable inferences to be drawn from the

20    allegations, including inferences unfavorable to the plaintiffs." *Gompper v. VISX, Inc.*, 298 F.3d

21    893, 897 (9th Cir. 2002). The Court "should consider all the allegations in their entirety,

22    together with any reasonable inferences therefrom, in concluding whether, on balance, the

23    plaintiffs' complaint gives rise to the requisite inference of scienter." *Id.* "Conclusory

24    allegations of law and unwarranted inferences, however, are insufficient to defeat a motion to

25    dismiss." *In re Northpoint Communications Group, Inc. Sec. Lit.* (*Northpoint II*), 221 F. Supp.

26    2d 1090, 1094 (N.D. Cal. 2002).

27    Finally, the Court may consider the facts alleged in the complaint, documents attached to

28    the complaint, documents relied upon but not attached to the complaint when the authenticity of

1    those documents is not questioned, and other matters for which the Court can take judicial

2    notice.  *Northpoint II*, 221 F. Supp. 2d at 1094; *see also Silicon Graphics*, 183 F.3d at 986.

3    **B.       Request for Judicial Notice.**

4          Defendants request that the Court take judicial notice of IntraBiotics' press releases,

5    SEC filings, and the FDA's document entitled Guidance for Industry, all of which are

6    referenced in the Complaint or are publicly filed documents.  Plaintiffs do not dispute the

7    accuracy of the documents attached to the request, and the requested documents are the types of

8    documents of which this Court properly make take judicial notice.  *See, e.g., In re Calpine*

9    *Corp. Sec. Lit.*, 288 F. Supp. 2d 1054, 1076 (N.D. Cal. 2003) (court "may properly take judicial

10   notice of SEC filings and documents expressly referenced" in a complaint); *see also Plevy v.*

11   *Haggerty*, 38 F. Supp. 2d 816, 821 (C.D. Cal. 1998).  Accordingly, the Court GRANTS

12   Defendants' request.

13   **C.       Plaintiffs Fail To Plead Sufficient Facts to Demonstrate Falsity.**

14         The PSLRA requires that Plaintiffs allege with the requisite particularity each statement

15   alleged to be false or misleading, the reason or reasons why the statement was false or

16   misleading, and if those allegations are made on information and belief, all facts on which that

17   belief is formed.  *See* 15 U.S.C. § 78u-4(b)(1)(B); *see also Employers Teamsters Local Nos. 175*

18   *and 505 Pension Trust Fund v. Clorox Co.*, 353 F.3d 1125, 1134 (9th Cir. 2004).  Plaintiffs fail

19   to meet this standard.

20         Plaintiffs set forth the statements which they contend are materially false and misleading

21   in paragraphs 62, 65, 70, 72, 74, 75, 78, 80 of their Complaint.  These paragraphs contain large

22   block quotes, but Plaintiffs clarified at the hearing on Defendants' motion which specific

23   statements within these paragraphs Plaintiffs contend are false.[5]  The Court will address these

24   allegedly false statements.

25

26         [5] Throughout the Complaint, Plaintiffs engage in a pattern of quoting long excerpts
     from documents which contain multiple statements.  Plaintiffs are responsible for identifying
27   with particularity what statements are false and misleading.  15 U.S.C. § 78u-4(b)(1).  They
     have not fulfilled their responsibility in this regard.  If Plaintiffs chose to file an amended
28   complaint, Plaintiffs should clearly identify which specific statements within the documents
     or block quotes they contend are false or misleading.

United States District Court

For the Northern District of California

12

**1.      Statements Made in September 2003 Before the Phase II/III Trial Began.**

On September 5, 2003, IntraBiotics issued a press release in which it stated:

> Designation as a fast track drug indicates that the FDA will facilitate the development and expedite the review of a new drug that is intended to treat a serious or life-threatening condition and that demonstrates the potential to address an unmet medical need.  In a letter to the company, the FDA stated: "We are granting fast track designation for the following reasons:
> There are currently no products approved (topical or systematic) for the prevention of ventilatory-associated pneumonia.
> Ventilator-associated pneumonia is commonly recognized as a highly morbid condition in critically ill patients.  Prevention of this disorder is desirable."
> ... "VAP is a devastating complication experienced by critically ill patients who are vulnerable to infection because of the requirement for artificial ventilation," said Dr. Marin Kollef, Associate Professor of Medicine at Washington University School of Medicine, Pulmonary and Critical Care Division in St. Louis. "Experts have long believed that pneumonia in patients should be preventable through the use of antibiotic decontamination of the mouth, but so far we have lacked the appropriate antibiotic - one that can be safely applied into the mouth and not worsen problems of antibiotic resistance.  This approach has become more important as bacterial resistance to antibiotics continues to grow and the development of new antibiotics to cope with resistance has lagged.  Because of iseganan's properties, VAP represents a logical an important potential application.  We look forward to the results of the upcoming pivotal clinical trials."
> ... "We are pleased to be working with the FDA to finalize the protocol for [the upcoming Phase II/III trial] because of the FDA's expertise in trial design and review.  We believe that patients with VAP will benefit from FDA input by virtue of assuring that the collected data will support expeditious product registration if the trials are successful," said Dr. Henry Fuchs, President and CEO of IntraBiotics.

(Compl. ¶ 62.)

Plaintiffs argued at the hearing that there were two false statements within this press release: (1) "[Iseganan] demonstrates the potential to address an unmet medical need;" and (2) "Because of iseganan's properties, VAP represents a logical an important potential application."  The press release does not actually contain a statement made by *Defendants* that *Iseganan* "demonstrates the potential to address an unmet medical need."  Read carefully, the first sentence merely describes what designation as a fast track drug by the FDA generally indicates.  At most, the press release implies that the FDA concluded that isgenan has demonstrated the potential to address an unmet need when it decided to designate it as a fast track drug.  The Court will not address the adequacy of a statement that was not actually made by Defendants.  If Plaintiffs chose to amend their complaint, they should clarify what exactly statement they contend is false and why.  If the allegedly false statement was not made directly by Defendants,

United States District Court

For the Northern District of California

1    or if the alleged falsity is an inference created by a statement, Plaintiffs should be prepared to

2    demonstrate how Defendants may be held liable.

3         The second statement Plaintiffs allege is false in the September 5, 2003 press release was

4    made by Dr. Marin Kollef, rather than by Defendants.  Plaintiffs have not provided any authority

5    or argument demonstrating how Defendants may be held liable for a statement made by a third

6    party that they quote in a press release.  However, even assuming *arguendo* that Defendants

7    could be liable for a third-party's statement, Plaintiffs' complaint suffers from additional

8    defects.

9         Plaintiff alleges that the two statements from the September 5, 2003 press release, as

10   well as Defendants' statement "Agreement with the FDA on the design of these clinical trials is

11   important to assure expeditious registration if the trials are successful" from a September 19,

12   2003 press release were false and misleading because (1) Defendants had no intention of

13   following the protocols of the Food and Drug Administration ("FDA") to report adverse results

14   and (2) because Defendants failed to disclose that isgegan had failed in previous trials because it

15   caused increased nausea.  (Compl. ¶¶ 64, 65, 67.)  Because Plaintiffs' allegations are made on

16   information and belief, the complaint must "state with particularity all facts on which that belief

17   is formed."  15 U.S.C. § 78u-4(b)(1).  Plaintiffs fail to do so.

18        It is not clear what allegations support Plaintiffs' argument that Defendants had no

19   intention, even before the Phase II/III trial for VAP began, of reporting the results as they

20   became aware of them.  Moreover, even if true, is not clear how Defendants' alleged intention

21   to not follow the FDA's protocols undermine the veracity of these three statements.  Finally, it is

22   not clear why increased incidents of nausea when iseganan was used to treat oral mucositis

23   would have put Defendants on notice that iseganan would not be effective for treating VAP.

24   The Complaint does not contain any allegations regarding whether the dosages of these two

25   trials were the same, whether iseganan was administered in the same manner in these trials

26   and/or whether administering the drug in a different manner would have made a difference.

27   Additionally, considering the life-threatening nature of VAP, increased incidents of nausea may

28   or may not be considered problematic.  On the other hand, if patients with VAP are on

14

United States District Court

For the Northern District of California

1    ventilators, perhaps increased nausea could be extremely dangerous.  Plaintiffs do not allege any

2    facts to support drawing an inference either way.  Therefore, the Court concludes that Plaintiffs

3    fails to sufficiently allege the reason or reasons why such statements were false or misleading or

4    to sufficiently allege the facts on which Plaintiffs' beliefs were formed.  *See* 15 U.S.C. § 78u-

5    4(b)(1).

6         **2.       Statements Made Between October 2003 and April 2004.**

7         Plaintiffs allege Defendants made the following additional false statements:

8    (1)  "In addition to substantially increasing our cash resources, we achieved a series of major

9         milestones over the last three months which have significantly strengthened and

10        repositioned [IntraBiotics] for future growth," made on October 29, 2003;

11   (2)  "Assuming successful completion of these trials, iseganan has a clear path to registration

12        for the prevention of VAP, a major unmet medical need worldwide," made on October

13        29, 2003;

14   (3)  "Iseganan may also have potential applications for a variety of other infections that we

15        will begin to explore in the near future," made on October 29, 2003;

16   (4)  "Our selection builds on iseganan's Fast Track status and Special Protocol Assessment

17        (SPA) agreement to potentially further speed and clarify the pathway to approval for this

18        agent for VAP, an important unmet medical need," made on February 12, 2004;

19   (5)  "We have made significant progress in 2003, advancing our product candidate,

20        [iseganan], and defining a clear pathway to registration in the United states for a large

21        unmet medical need," made on March 4, 2004;

22   (6)  "Safe and Well-Tolerated. Based on our experience to date, iseganan appears to be safe

23        and well-tolerated at therapeutically relevant doses when administered to the oral cavity,

24        the planned route of administration for the prevention of VAP.  In particular, iseganan

25        has been delivered to the oral cavity of more than 800 patients to date, with no

26        differences in adverse events between the active and placebo groups observed

27        consistently among the trials," made on April 22, 2004;

28

15

United States District Court

For the Northern District of California

(7)   "We believe that these features will provide important benefits to patients and their
physicians.  Iseganan may allow physicians to effectively prevent and treat infections
without: • precisely knowing the offending pathogen; • using multiple antimicrobial
drugs; • engendering resistence; and • compromising future use of antimicrobial drugs,"
made on April 22, 2004;

(8)   "We believe that iseganan has an attractive profile as an agent for the prevention of
VAP," made on April 22, 2004; and

(9)   "The accomplishments will enable us to maintain our momentum, and meet a number of
key goals including the initiation of a Phase II trial for the potential treatment of lung
infections associated with cystic fibrosis in the second half of the year," made on May
10, 2004.

(Compl. ¶¶ 72, 74, 78, 80, 86).[6]

Plaintiffs allege these statements were materially false and misleading because
Defendants had no intention of complying with their obligation to report adverse results to the
FDA.  (*Id.* at ¶¶ 73, 77, 79, 82.)  As discussed above, Plaintiffs have not alleged sufficient facts
to support drawing such an inference.  Plaintiffs further contend the above statements were false
because Defendants had access to the interim results of the Phase II/III trial for VAP and thus
knew or should have known that iseganan was not safe and well-tolerated at therapeutically
relevant doses when administered to the oral cavity and known that iseganan caused a higher
rate of VAP and mortality.  (*Id.*)  The Phase II/III trial for VAP was double blinded, meaning
that neither the participants nor the research team knew during the trial which participants
received isegenan and which participants received the placebo.  (*Id.* at ¶¶ 43, 60.)  The trial was

---

[6]  Plaintiffs also contend the following statements by Defendants are false: (1) "The
first of two planned pivotal trials is now well underway to evaluate iseganan oral solution for
the prevention of VAP in 900 patients in the U.S. and Europe, and data is expected by the
end of this year;" (2) "Patient accrual is now well underway and we expect to have results
from the first trial by the end of this year; (3) "The first pivotal trial began enrolling patients
in September 2003 and has enrolled more than 450 patients.  It is anticipated that results from
this trial will be available in the fourth quarter of 2004;" and (4)  "We are now more than
halfway through enrollment of the first two pivotal clinical trials for our lead product
candidate, iseganan, for the prevention of [VAP]."  (Compl. ¶¶ 75, 78, 80, 86.)  However, it
is not clear how, even if Plaintiffs had plead sufficient factual bases for all their allegations
and arguments, these statements would be false.

United States District Court

For the Northern District of California

1    conducted on a fourteen-day cycle per patient. (*Id*. at ¶ 68.)  The Complaint does not allege

2    when the trial began or when it should have been clear, based on the interim results, even if they

3    remained blinded, that iseganan was causing adverse results.  Although it is possible that

4    Defendants could have known of the adverse results sooner than when they terminated the trial

5    in June 2004, the Complaint does not allege sufficient facts to support an inference as to when

6    Defendants may have obtained such information.

7         With respect to the Defendants' statements regarding the possible use of iseganan to

8    treat other diseases, Plaintiffs also fail to allege any facts to support an inference that Defendants

9    knew such statements were false.  Although Plaintiffs allege that at the time of the Phase II/III

10   trial, Defendants were focusing on the use of iseganan to treat VAP, Plaintiffs do not allege any

11   facts indicating that Defendants had no intention of conducting additional research with respect

12   to other diseases in the future.

13        In sum, Plaintiffs have not sufficiently plead facts to show that any of Defendants'

14   statements were materially false or misleading.  However, the Court will grant Plaintiffs' leave

15   to amend.  At the hearing, Plaintiffs stated they could allege more details regarding the interim

16   results.  Defendants' reliance on *In re Columbia Laboratories, Inc. Securities Litigation*, 144 F.

17   Supp. 2d 1362, (S.D. Fla. 2001) for the proposition that Defendants could not have access to the

18   data prior to its termination because the trial was double blinded is misplaced.  In that case, the

19   plaintiffs did not allege that the defendants were aware of the results of the studies before the

20   alleged misrepresentations were made.  In fact, the plaintiffs' counsel even conceded that the

21   defendants thought there was a chance the study would succeed.  *Id*. at 1369-70.  Moreover, in

22   *Columbia Laboratories*, the results of the study were analyzed and disclosed after the study was

23   completed.  Here, it is undisputed that the trial was terminated mid-way.  Thus, at some point

24   mid-way through the trial, the DSMB was able to determine that iseganan was not achieving its

25   goals and was unsafe and informed Defendants of such information.  If the DSMB, and then

26   Defendants, were able to determine before the trial was completed that iseganan was not

27   achieving its goals and was unsafe, then it is possible that the DSMB and Defendants had such

28   information even sooner than the decision to terminate the trial was announced.  The problem

with Plaintiffs' Complaint is that it provides no basis for determining, or even inferring, when, Defendants may have had such information.  Accordingly, the Court grants Defendants' motion to dismiss Plaintiffs' Section 10(b) claim, as well as Plaintiffs' Section 20(a) claim.

**D.    Scienter.**

The PSLRA also requires a plaintiff to allege particular facts giving rise to a strong inference that "the defendant made false or misleading statements either intentionally or with deliberate recklessness."  *Vantive*, 283 F.3d at 1085; 15 U.S.C. § 78u-4(b)(2).  Where the pleadings are not sufficiently particularized or where, even taken as a whole, they do not raise a strong inference of scienter, dismissal pursuant to Rule 12(b)(6) is proper.  *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1038 (9th Cir. 2002).  Moreover, to determine whether a plaintiff has pled a strong inference of scienter, "the court must consider all reasonable inferences to be drawn from the allegations, including inferences unfavorable to the plaintiffs."  *Gompper*, 298 F.3d at 897.

Because Plaintiffs fail to allege false and misleading statements, the Court will not address whether Plaintiffs sufficiently plead scienter.  However, the Court notes that with respect to pleading the requisite intent by Earnest Mario and Kevin Tang in particular, Defendants point to some potentially insurmountable obstacles.  Defendants submitted documents of which the Court make take judicial notice which indicate that Tang and Mario purchased IntraBiotics' stock on October 6, 2003 and May 5, 2004, respectively.  (Declaration of Cheryl W. Foung, Exs. 10, 12.)  Moreover, Plaintiffs themselves allege that Mario and Tang's firm, Tang Capital Partners, LP, were among the investors who helped raise $3.5 million to help start the Phase II/III trial for VAP in February 6, 2003.  (Compl. ¶ 59.)  Personally investing their own money near to the time when the company announced it was terminating the trial tends to undermine any inference of scienter with respect to these defendants.  If Plaintiffs amend their Complaint, they should take care to plead facts which could demonstrate that Mario and Tang invested less than they had at risk if the Phase II/III trial for VAP had not been funded or had been terminated earlier.

**United States District Court**

For the Northern District of California

**E.    Plaintiffs' Section 11 and 15 Claims Are Sufficiently Alleged**

Defendants attack Plaintiffs' Section 11 claim regarding false statements or omissions made in a registration statement on two grounds: (1) Plaintiffs fail to allege fraud with sufficient particularity, and (2) Plaintiffs fail to allege Representative Plaintiff Buche purchased stock that is traceable to the registration statement.

Plaintiffs' Section 11 claim is not governed by the heightened pleading standards under the PSLRA. *Falkowski v. Imation Corp.*, 309 F.3d 1123, 1133 (9th Cir. 2002). Section 11 claims which are "grounded in fraud" are subject to the requirements under Federal Rule of Civil Procedure 9(b) that allegations of fraud be pled with particularity. *In re Stac Electronics Securities Litigation*, 89 F.3d 1399, 1404-1405 (9th Cir. 1996). However, Plaintiffs allege that their Section 11 claim is not premised on fraudulent or intentional conduct. (Compl. ¶ 128.) Plaintiffs reiterate this point in their opposition to Defendants' motion to dismiss. (Opp. at 25.) Defendants do not respond to this argument in their reply brief. Defendants may be held liable for "innocent or negligent material misstatements or omissions" under Section 11. *See Kaplan*, 49 F.3d at 1371. Because Plaintiffs do not contend the alleged misstatements or omissions were fraudulent for purposes of their Section 11 claim, this claim does not need to be pled with particularity.

To maintain a Section 11 claim, Plaintiffs must allege, and eventually prove, that the stocks Buche purchased were issued were issued under the registration statement containing the misstatements or omissions. *Hertzberg*, 191 F.3d at 1080. In *Hertzberg*, the Ninth Circuit noted that it might be difficult to prove stocks were issued pursuant to a particular registration statement if a company issued stock under more than one registration statement. *Id*. Defendants argue that Plaintiff have not and cannot allege, let alone prove, that Buche's stocks are traceable to the allegedly false registration statement. However, Plaintiffs allege that Buche purchased stock pursuant to or traceable to the registration statement at issue in this case. (Compl. ¶ 132.) At this procedural stage, such allegations are sufficient. *See In re SeeBeyond*, 266 F. Supp. 2d at 1171 (denying motion to dismiss where plaintiff alleged it purchased stock pursuant to the registration statement, and noting "whether the plaintiff is able to trace its stock is not a question

19

**United States District Court**

For the Northern District of California

1    that can be resolved on this motion."); *see also In re Global Crossing, Ltd. Securities Litigation*,

2    313 F. Supp. 2d 189, 208 (S.D.N.Y. 2003) ("[T]he pleading requirement is not elaborate.

3    Plaintiffs have not been required to explain how their shares can be traced; general allegations

4    that plaintiff purchased 'pursuant to' or traceable to false registration statement have been held

5    sufficient to state a claim.").  Because the Court concludes that Plaintiffs have sufficiently

6    alleged their Section 11 claim, Plaintiffs' Section 15 claim premised on the underlying Section

7    11 claim is sufficiently alleged as well.  Accordingly, the Court denies Defendants' motion to

8    dismiss Plaintiffs' Section 11 and 15 claims.

9    **F.    Defendants' Motion to Require an Undertaking.**

10           Defendants argue that Buche cannot prove his stocks are traceable to the allegedly false

11   registration statement, and thus move pursuant to Section 11(e) to require Buche to furnish an

12   undertaking with respect to his Section 11 claim.  Pursuant to Section 11(e), a district court has

13   "discretion to require a party to post security to cover the costs and attorneys fees of opposing

14   parties." *Weil v. Investment/Indicators, Research and Management, Inc.*, 647 F.3d 18, 22 (9th

15   Cir. 1981) (citing 15 U.S.C. § 77k(e)).  A court may require an undertaking if a plaintiff files a

16   suit in bad faith or the plaintiff's claim "borders on the frivolous."  *Id*.  However "[r]equests for

17   an undertaking are generally disfavored."  *Gould v. Harris*, 929 F. Supp. 353, 361 (C.D. Cal.

18   1996), *abrogated in part on other grounds by Hertzberg v. Partners, Inc.*, 191 F.3d 1076 (9th

19   Cir. 1999).  Notably, even if the Court does not require an undertaking, the Court may assess

20   litigation costs against Plaintiffs if and when a judgment in favor of Defendants is entered.  *Id*.

21   (citing 15 U.S.C. § 77k(e)).

22           Here, Defendants only argue that Plaintiffs' Section 11 claim is frivolous, not that it was

23   brought in bad faith.  Defendants contend that Plaintiffs cannot prove standing (i.e. that Buche's

24   shares are traceable) or that Defendants failed to disclose side effects.  The Court has already

25   concluded that Plaintiffs sufficiently allege traceability.  It is not yet known whether Plaintiffs

26   ultimately will be able to prove traceability.  The Court declines to hold that there are no

27   circumstances under which Plaintiffs could prevail on this issue.  As the court noted in *Lilley v.*

28   *Charren*, 936 F. Supp. 708, 716 (N.D. Cal. 1996), plaintiffs could establish standing for a

Section 11 claim by identifying the purchasers of the unregistered shares. The Court further declines to hold that Plaintiffs' claims regarding false and misleading statements are frivolous. Thus, the Court denies Defendants' motion for an undertaking.

### IV. CONCLUSION

For the foregoing reasons, the Court GRANTS IN PART and DENIES IN PART Defendants' motion to dismiss as follows: (1) the Court GRANTS Defendants' motion to dismiss Plaintiffs' first and second claims with leave to amend; and (2) the Court DENIES Defendants' motion to dismiss Plaintiffs' third and forth claims. Plaintiffs SHALL file any amended complaint within thirty days of the date of this Order. If an amended complaint is filed, Defendants shall either file an answer or move to dismiss within twenty days of service of the amended complaint. If Plaintiffs do not file an amended complaint, Defendants shall file an answer within twenty days after Plaintiffs' time to file an amended complaint has expired.

The Court DENIED Defendants' motion for an undertaking.

**IT IS SO ORDERED.**

Dated: January 23, 2006

_____
JEFFREY S. WHITE
UNITED STATES DISTRICT JUDGE

**United States District Court**

For the Northern District of California