1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court

For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

In re INTRABIOTICS PHARMACEUTICALS,
INC. SECURITIES LITIGATION,

This document relates to:

All Actions

_____/

No. C 04-02675 JSW

**CLASS ACTION**

**NOTICE OF TENTATIVE
RULING AND QUESTIONS**

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD, PLEASE TAKE

NOTICE OF THE FOLLOWING **TENTATIVE** RULING AND QUESTIONS FOR THE

HEARING SCHEDULED ON MAY 26, 2006:

The Court **tentatively GRANTS** Defendants' motion to dismiss and **RESERVES**

**RULING** on whether to provide Plaintiffs leave to amend, and the Court **tentatively DENIES**

Defendants' motion to certify for interlocutory appeal. The Court has reviewed the parties'

papers and, thus, does not wish to hear the parties reargue matters addressed in those pleadings.

If the parties intend to rely on authorities not cited in their briefs, they are ORDERED to notify

the Court and opposing counsel of these authorities reasonably in advance of the hearing and to

make copies available at the hearing. If the parties submit such additional authorities, they are

ORDERED to submit the citations to the authorities only, without argument or additional

briefing. *C.f.* N.D. Civil Local Rule 7-3(d). The parties will be given the opportunity at oral

argument to explain their reliance on such authority.

The parties shall each have 25 minutes to address the following questions:

(1)     Despite the Court's admonition to Plaintiffs to identify clearly which specific statements within the documents or block quotes they contend are false or misleading in their amended complaint, Plaintiffs failed to do so.  Precisely which statements in the block quotes alleged in paragraphs 72, 77, 84, 87, 98, 101, 103, 106, and 114 of the Second Consolidated Amended Complaint ("SCAC") do Plaintiffs contend are materially false and misleading?

(2)     If Plaintiffs allege that the statements attributed to Dr. Marin Kollef in the press release dated September 5, 2003 were materially false and misleading, on what basis do Plaintiffs contend that such statements may be attributed to IntraBiotics?

(3)     Plaintiffs allege that Defendants failed to keep each investigator "informed of new observations discovered by or reported to the sponsor" and failed to "review and evaluate the evidence relating to the safety and effectiveness of [iseganan] as it is obtained from the investigator" in violation of 21 C.F.R. §§ 312.55(b) and 312.56(c). (SCAC, ¶ 90.)  On what facts do Plaintiffs rely to assert this allegation?

(4)     What authority supports or contradicts Plaintiffs' position that receiving compensation of between $7,500 and $30,000 over a three year period makes a steering or advisory committee ineffective or conflict ridden?  What specific protocol or FDA regulations and/or guidelines do Plaintiffs allege Defendants violated by providing such compensation to steering committee members?

(5)     Plaintiffs allege that Contract Research Organizations ("CRO") received the interim test results from testing sites on a monthly basis in the form of case report forms ("CRF") and then forwarded the CRFs to the Intrabiotics.  (SCAC, ¶¶ 5, 66.)

        (a)     On what basis do Plaintiffs have knowledge that the CROs received the interim test results on a monthly basis?

        (b)     How do Plaintiffs know that the CRFs were forwarded to the Company on a monthly basis?

(6)     Plaintiffs allege that "CW2 received emails attaching Intrabiotics queries about submitted CRF's regularly."  (SCAC, ¶ 89.)

        (a)     How regularly did IntraBiotics send queries regarding the CRFs?

        (b)     What was the substance of IntraBiotics' queries?

(7)     Plaintiffs allege that the CRFs set forth any serious adverse events that occurred, with a description of the investigator's opinion of whether it was attributable to the underlying

disease or to the treatment, but does not specify what the CRFs actually stated or what the opinions of the investigators were.

(a)     Do Plaintiffs have information on the CRFs from which they could provide more detailed allegations regarding what information the CRFs conveyed?

(c)     Specifically, what information do Plaintiffs contend the CRFs contained and who had access to the CRFs?

(8)     Plaintiffs allege that Defendants conducted "several safety reviews" before the interim analysis, but do not provide any details regarding such alleged safety reviews.  (SCAC, ¶ 91.)  Do Plaintiffs have any information regarding these safety reviews other than what the Iseganan report states, such as when the alleged safety reviews occurred, who conducted them, and what they revealed?

(9)     Plaintiffs allege that the data from the CROs was due to be submitted to the independent monitoring committed ("DMC") by April 9, 2004.  Do Plaintiffs have any information indicating that the data from all the CROs was actually submitted by April 9, 2004?

(10)    Do Plaintiffs have information indicating that the DMC actually reviewed and analyzed the data, and informed Defendants of the results, sooner than June 22, 2005?  If so, by when were Defendants aware of the interim results?

(11)    Plaintiffs argue that even if the increased number of deaths and VAP in patients who were administered iseganan is not statistically significant, the increased deaths and incidents of VAP were "red flags" which rendered misleading Defendants' statements regarding the safety of iseganan.  However, courts have recognized that until adverse incidents are statistically significant, reports of adverse incidents may be random and may not establish the requisite nexus between the drug being tested and the adverse events to allege materiality.  *See Oran v. Stafford*, 226 F.3d 275, 284 (3rd Cir. 2000) (holding that withheld adverse reaction reports did not provide statistically significant evidence and thus were not material); *In re Carter-Wallace, Inc. Sec. Litig.*, 150 F.3d 153, 157 (2nd Cir. 1998) (holding that "[d]rug companies need not disclose isolated reports of illnesses suffered by users of their drugs until those reports provide statistically significant evidence that the ill effects may be cause by - rather than randomly associated with - use of the drugs and are sufficiently serious and frequent to affect future earnings").

(a)     Plaintiffs support their argument that any failure to allege statistically significant differences between the iseganan and placebo groups would not be a fatal defect with cases applying the more lenient pleading requirements of Federal Rule of Civil Procedure 8.  Do Plaintiffs have any authority applying the pleading

requirements of the Private Securities Litigation Reform Act to support this argument?

(b)    On what authority applying the applicable pleading standards do Plaintiffs rely to demonstrate that an increase in adverse events that is not statistically significant may render misleading a company's affirmations of a drug's safety?

(c)    At what point do Plaintiffs contend adverse effects attributable to iseganan, as opposed the poor health of the patients, were apparent to Defendants?  Based on what information do Plaintiffs make this assertion?

(d)    Do Plaintiffs have any additional information regarding what Defendants knew regarding the VAP trials that they could allege to demonstrate Defendants were aware of a statistically significant rate of death and VAP in the patients receiving iseganan before June 22, 2005?

(12)    If the Court were to allow Plaintiffs to engage in discovery limited to the issue of traceability and then file a motion for summary judgment on this issue, how much time would Plaintiffs need to conduct such discovery and file such motion?

(13)    Do the parties have anything further to add?

Dated:  May 25, 2006

_____
JEFFREY S. WHITE
UNITED STATES DISTRICT JUDGE

United States District Court

For the Northern District of California