United States District Court

For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

In re INTRABIOTICS PHARMACEUTICALS,
INC. SECURITIES LITIGATION,

This document relates to:

    All Actions

_____/

No. C 04-02675 JSW

**CLASS ACTION**

**ORDER (1) GRANTING DEFENDANTS' MOTION TO DISMISS SECOND CONSOLIDATED AMENDED COMPLAINT WITH PREJUDICE AND (2) RESERVING RULING ON DEFENDANTS' MOTION TO AMEND OR CERTIFY FOR APPEAL**

    Now before the Court is the motion to dismiss the Second Consolidated Amended Complaint ("SCAC") filed by defendants IntraBiotics Pharmaceuticals, Inc. ("IntraBiotics"), Henry J. Fuchs ("Fuchs"), Detlef Albrecht ("Albrecht"), David J. Tucker ("Tucker"), Ernest Mario ("Mario"), Kevin C. Tang ("Tang"), Mark L. Perry ("Perry"), Gary A. Lyons ("Lyons"), Jerry Jackson ("Jackson") and Jack S. Remington ("Remington") (collectively "Defendants"). Defendants move to dismiss asserting that Plaintiffs fail to meet the heightened pleading requirements of the Private Securities Litigation Reform Act ("PSLRA") and fail to state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6). Defendants further assert that allowing amendments to the SCAC would be futile and request that the Court dismiss this action with prejudice. Also before the Court is Defendants' motion to amend or certify for interlocutory appeal the Court's order issued on January 23, 2006, denying Defendants' motion to dismiss the claims brought under 15 U.S.C. §§ 77k and 77o ("Section 11" and "Section 15" claims) which are based on the registration statement filed on April 14, 2004.

United States District Court

For the Northern District of California

1   Having carefully reviewed the parties' papers, considered their arguments and relevant

2   legal authority, and having had the benefit of oral argument, the Court hereby grants

3   Defendants' motion to dismiss with prejudice.  The Court reserves ruling on Defendants'

4   motion to certify for interlocutory appeal and directs the parties to file further briefing with

5   respect to Plaintiffs' Section 11 and 15 claims.

6                                        **BACKGROUND**

7   The allegations from the Complaint are extensively detailed in the Court's order dated

8   January 23, 2006, on Defendant's first motion to dismiss and need not be reiterated here.

9   Accordingly, the Court will focus on the allegations added in the SCAC and determine whether,

10   based on such additional allegations, Plaintiffs sufficiently allege any materially false or

11   misleading statements and scienter.

12   On January 23, 2006, the Court granted Defendants' motion to dismiss Plaintiffs'

13   Corrected Consolidated Amended Class Action Complaint ("Complaint") and dismissed

14   Plaintiffs' claims brought under Sections 10(b) and 20(a) of the Securities Exchange Act of

15   1934, 15 U.S.C. §§ 78j(b) and 78t(a), and the rules and regulations promulgated thereunder,

16   with leave to amend.  The Court held that Plaintiffs failed to sufficiently allege materially false

17   or misleading statements made by Defendants.  In particular, the Court found that Plaintiffs

18   failed to provide sufficient support for their allegations that Defendants had access to the interim

19   results of the Phase II/III trial for VAP and thus knew or should have known that iseganan was

20   not safe and well-tolerated at therapeutically relevant doses when administered to the oral cavity

21   and that iseganan caused a higher rate of VAP and mortality.  Moreover, the Court noted that

22   the Phase II/III trial for VAP was a double-blind trial and that the Complaint did not allege when

23   the trial began or when it should have been clear, based on the interim results, even if they

24   remained blinded, that iseganan was causing adverse results.

25   In the SCAC, Plaintiffs allege that IntraBiotics hired contract research organizations

26   ("CROs") to assist in the management and monitoring of the Phase II/III trial for VAP and that

27   the CROs received interim test results from the testing sites on a monthly basis in the form of

28   case report forms ("CRFs").  (SCAC, ¶ 5.)   The CROs would then forward the CRFs to

IntraBiotics, which in turn "would frequently prepare queries based on the individual CRFs addressed to the trial investigator responsible for the CRF, seeking clarification on the information contained in the CRF." (*Id.*)

Plaintiffs explain that the CRFs were standard form documents used uniformly by the investigators at the different sites. (*Id.*, ¶ 6.) "The CRF contained a section entitled 'Serious adverse events' to be filled out by the investigator if there was an adverse event to report. If there was a serious adverse event, a follow up section on the CRF addressed whether such event was due to common evolution of the underlying disease or to the treatment. A serious adverse event included illness or death." (*Id.*)

Plaintiffs further allege that Fuchs, IntraBiotics' CEO, informed investigators that Defendants "were working closely with our clinical investigators" during the VAP trials and that "Defendants were informed throughout the Class Period of the interim results, the serious adverse events, and the overall progress of these pivotal VAP Trials." (*Id.*, ¶ 7.)

According to Plaintiffs, the independent monitoring committee ("DMC") for the Phase II/III trial for VAP conducted an interim analysis of the unblinded data when approximately one-third of the patients had completed the trial to evaluate the efficacy of iseganan and assess the benefits and risks of the study. (*Id.*, ¶ 9.) The CROs, such as Advanced Clinical Trials, Inc. and Orion Clinical Services, Ltd., were responsible for providing the DMC with these interim results. (*Id.*, ¶¶ 65, 66.) On March 4, 2004, Joe Parks, a senior program director at IntraBiotics, informed the VAP trial clinical investigators that the trial had reached the requisite 300 enrollees to trigger the commencement of the interim analysis, and instructed the investigators to submit by April 9, 2004 the data for patients enrolled on or before March 5, 2004. (*Id.*, ¶ 9.) According to a confidential witness, a clinical investigator who was intimately knowledgeable about the details of the trial and reported to the principal investigator involved in a VAP trial in France ("CW2"), his team provided their data to a CRO before the April 9, 2004 deadline. (*Id.*, ¶ 94.)

The DMC concluded from the interim analysis that more patients who were administered iseganan than the placebo died during the trial. (*Id.*, ¶ 10.) Plaintiffs rely on the

United States District Court

For the Northern District of California

results as reported in *A Randomized Double-Blind Trial of Iseganan in Prevention of Ventilator-associated Pneumonia*, dated September 28, 2005, and published in the 2006 American Journal of Respiratory and Critical Care Medicine ("Iseganan Report"), to support for their allegations as to what the Defendants and the DMC knew about the interim analysis.

The Iseganan Report, provides in pertinent part:

**Measurements and Main Results: A total of 709 patients were randomized and received at least one dose of study drug. ... The rate of VAP among survivors at Day 14 was 16% (45/282) in patients treated with iseganan and 20% (57/284) in those treated with placebo (p = 0.145). Mortality at Day 14 was 22.1% (80/362) in the iseganan group compared with 18.2% (63/347) in the placebo group (p = 0.206). No pattern of excess adverse events in the iseganan group compared with placebo was observed.**
**Conclusions: Iseganan is not effective in improving the outcome in patients on prolonged medical ventilation.**
...
**METHODS**
**Study Design**
We conducted a multinational, double-blind, randomized, placebo-controlled trial of iseganan versus placebo in intubated patients receiving mechanical ventilation for up to 14 d. The primary endpoint was the occurrence of microbiologically confirmed VAP measured among survivors up through Day 14.  Secondary endpoints were VAP-free survival (VAP or death) through Day 14 and duration of parenteral antibiotic use and mechanical ventilation measured among survivors through Day 21.
**Study Organization**
Forty-eight centers from six countries ... participated in the trial. The study protocol was approved by the institutional review boards and ethics committees of participating institutions. ... A study steering committee was responsible for overseeing study design, conduct, and analyses. During the trial, the steering committee reviewed study quality metrics of blinded data on a regular basis, including select eligibility requirements and study drug compliance. An independent monitoring committee (DMC) was responsible for ensuring the safe and ethical conduct of the trial and had sole access to unblinded data. The sponsor did not have access to unblinded or to aggregate outcome data during the study. In addition to several safety reviews, a single interim analysis by the DMC was performed when approximately one-third of the patients had completed the 21-d study. The purpose of the interim analysis was to evaluate safety and trial integrity from unblinded data and to evaluate efficacy to assess benefits/risks of the study.
...
**Definitions and Data Collection**
Adverse events (AEs) were defined ... as any untoward medical occurrence in a patient or clinical investigation subject administered a pharmaceutical product and that does not necessarily have a causal relationship with the treatment. AEs were reported at maximum intensity experienced and graded on a 1 to 4 scale (mild, moderate, severe, life-threatening). Given the nature of the patient population, a significant number of AEs was expected.
...
**RESULTS**
**Recruitment**
Between September 9, 2003, and June 22, 2004, a total of 725 patients were enrolled, of whom 371 received iseganan and 354 received placebo. Sixteen

4

patients ... were randomized but did not receive any study drug. Therefore, 709 patients (362 iseganan arm, 347 placebo arm) are included in the intent-to-treat analysis. ... Enrollment was stopped on June 22, 2004, before the planned goal of 900 patients was reached, after a recommendation by the DMC. The DMC based its recommendation on the interim analysis of 300 patients that showed a higher rate of VAP and mortality in the iseganan arm.

...

**VAP among Survivors and VAP-free Survival**

... There were no significant differences in the rate of VAP among survivors between patients treated with iseganan (45/282, 16%) and those treated with placebo (57/284, 20%, p = 0.145). ...

Mortality at Day 14 was 22.1% (80/362) in the iseganan group compared with 18.2% (63/347) in the placebo group (p = 0.206.) There were 4% fewer VAP cases (14 vs. 18%) and 4% more deaths (22 vs. 18%) in the iseganan group as compared with placebo. Neither of these differences was statistically significant.

VAP-free survival also did not significantly differ between the two groups. The proportion of patients who survived and developed VAP or died within the 14-d treatment period was 34.5% (125/362) and 34.6% (120/347) for iseganan-treated and placebo-treated patients, respectively (p = 0.863.) ....

...

**Safety**

Of iseganan- and placebo-treated patients, 75 and 72%, respectively, experienced one or more AEs. Although the greatest difference in AEs was seen in the category of cardiovascular disorders, there was no discernible pattern in the type of cardiovascular events that could be attributed to iseganan. ...

...

**DISCUSSION**

... The DMC recommended stopping the trial early because of a higher, although not statistically significant, rate of VAP and death in the iseganan arm. The DMC determined that the higher rate of VAP in the iseganan arm would be unlikely to significantly reverse with study continuation and that harm, although unlikely, could not be conclusively ruled out. This outcome was unexpected in view of the abundant prior literature on oral decontamination and given the activity of iseganan against relevant pathogens.

... [T]he expected rate of VAP among survivors, the study's primary endpoint, was 18.75%. The observed rate among all patients included in the trial was almost exactly as predicted, at 18%. ... The literature suggested that 20% of the patients in the placebo arm would die by Day 14. The overall mortality rate in the trial was also estimated at 20%, because iseganan was not expected to influence survival. In the trial, the 14-d mortality rate for all patients was 19%. Thus, it appears the study closely mirrored the design assumptions for these critical parameters.

...

In summary, the topical administration of iseganan to the oropharynx of medically ventilated patients did not significantly reduce the incidence of VAP among surviving patients.

(Declaration of Cheryl W. Foung ("Foung Decl."), Ex. 27 (Iseganan Report).)

On June 23, 2004, IntraBiotics announced that it was terminating the VAP trials. (SCAC, ¶ 11.)

Plaintiffs also rely on another confidential witness, the personal assistant to a principal investigator for the trial at a site in Europe ("CW1"), to allege that defendant Fuchs "was quite

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1  hands on." (*Id.*, ¶ 69.) CW1 stated that Fuchs "always wanted to know if it was going well."

2  and that he "always spoke to her employer and asked if he could do anything to make them

3  happy in regards to the study." (*Id.*) Plaintiffs allege that CW1 believed that it was clear that

4  IntraBiotics "was very interested" in the trials. (*Id.*)

5      According to CW2, Fuchs visited the intensive care unit for a VAP trial in France, where

6  the trials were being conducted, several times. (*Id.*, ¶ 70.)

7              **Alleged Misrepresentations or Material Omissions**[1]

8      On September 5, 2003, Intrabiotics issued a press release, which contained the following

9  statement from Defendant Fuchs: "We are pleased to be working with the FDA on incorporating

10  their feedback into the protocol for the upcoming study because of the FDA's expertise in trial

11  design and review. We believe that patients with VAP will benefit from FDA input by virtue of

12  assuring that the collected data support expeditious product registration if the trials are

13  successful." (*Id.*, ¶ 72.) Plaintiffs allege that this statement was materially false and misleading

14  because Defendants had no intention of complying with the FDA protocols for the trials that

15  they were developing "to test their sole drug candidate, iseganan, which included FDA

16  regulations and guidelines regarding monitoring the trials and reporting adverse effects of the

17  drug to the FDA, by for example setting up an advisory board that was rife with conflicts." (*Id.*,

18  ¶ 76.)

19      On September 19, 2003, IntraBiotics issued a press release announcing that it reached a

20  Special Protocol Agreement with the FDA regarding the Phase II/III trial for VAP. (*Id.*, ¶ 77.)

21  On October 29, 2003, Defendant Fuchs commented that IntraBiotics' product, Iseganan, was in

22  late-stage clinical trials and that IntraBiotics had the resources necessary to complete the first of

23  two pivotal registration studies and expected to announce the results of the trial by the end of

24  2004. (*Id.*, ¶ 84.) Plaintiffs allege that the statements made on September 19 and October 29,

25  2003, were materially false and misleading because they omitted that Defendants had no

26  _____

27      [1] Despite the Court's prior admonition to Plaintiffs to identify clearly in their amended
complaint the specific statements within the documents or block quotes they contend are
false or misleading, Plaintiffs failed to do so. At the hearing on this motion, in response to
28  the Court's question, Plaintiffs clarified which statements they allege are materially
misleading. Only those statements are accordingly addressed in this Order.

intention of complying with the FDA protocols for the trials that they were developing "to test their sole drug candidate, iseganan, which included FDA regulations and guidelines regarding monitoring the trials and reporting adverse effects of the drug to the FDA, by for example setting up an advisory board that was rife with conflicts." (*Id.*, ¶¶ 79, 86.)

On February 12, 2004, IntraBiotics issued a press release announcing that it expected data on the Phase II/III trial for VAP by the end of 2004. (*Id.*, ¶ 87.) Plaintiffs allege that this statement was materially false and misleading because IntraBiotics had access to interim results through the CRFs and that through the CRFs, IntraBiotics was aware of, but failed to report, adverse results. (*Id.*, ¶¶ 89, 90.) Plaintiffs do not set forth any allegations regarding when they contend Defendants became aware of such results.

On March 4, 2004, IntraBiotics issued a press release stating, in pertinent part: "We have made significant progress in 2003, advancing our product candidate, [iseganan], and defining a clear pathway to registration in the United States for a large unmet medical need. ... Patient accrual is now well underway and we expect to have results from the first trial by the end of this year." (*Id.*, ¶ 98.)

On April 12, 2004, IntraBiotics issued a press release in which Defendant Albrecht stated: "Iseganan's safety profile and its antimicrobial attributes ...."[2] (*Id.*, ¶ 101.) On April 12, 2004, IntraBiotics also issued a second press release in which it commented that it could "take full advantage of the expanding opportunities we have with iseganan ... and facilitate iseganan's advancement toward the market for [VAP] ...." (*Id.*, ¶ 103.) On May 10, 2004, IntraBiotics issued a press release stating: "to maintain our momentum, and meet a number of key goals including the initiation of a Phase II trial for the treatment of lung infections associated with cystic fibrosis in the second half of the year."[3] (*Id.*, ¶ 114.)

Plaintiffs allege that each of the statements issued on March 4, April 12, and May 10, 2004, are false and misleading because IntraBiotics had access to the interim results for the

---

[2] This portion of a sentence is the entirety of what Plaintiffs allege is the misrepresentation.

[3] Again, this portion of a sentence is the entirety of what Plaintiffs allege is the misrepresentation.

United States District Court

For the Northern District of California

1   Phase II/III trial for VAP and the interim results, through IntraBiotics' access to the CRFs,

2   demonstrated that iseganan was not safe and well-tolerated and that the drug caused a higher

3   rate of VAP and mortality as compared to the placebo.  (*Id.*, ¶¶ 100, 102, 104, 115.)  Plaintiffs

4   further allege that these statements were misleading because Defendants failed to disclose that

5   they did not intend to comply with, and were in violation of, their obligation to report adverse

6   results to the FDA.  (*Id.*)

7        On April 14, 2004, IntraBiotics filed a registration statement with the United States

8   Securities and Exchange Commission ("SEC") in connection with its public offering of three

9   million shares of common stock.  The registration statement included the following statements:

10       • *Safe and Well-Tolerated.* Based on our experience to date, iseganan appears to
11       be safe and well-tolerated at therapeutically relevant doses when administered to
         the oral cavity, the planned route of administration for the prevention of VAP. In
12       particular, iseganan has been delivered to the oral cavity of more than 800 patients
         to date, with no differences in adverse events between the active and placebo
13       groups observed consistently among the trials ...

14       We believe that these features will provide important benefits to patients
         and their physicians. Iseganan may allow physicians to effectively prevent and treat
15       infections without:

16       • precisely knowing the offending pathogen;
         • using multiple antimicrobial drugs;
17       • engendering resistance; and
         • compromising future use of antimicrobial drugs.
18       ...
         ... Several other conditions for which iseganan may have utility are also
19       under investigation although at an earlier stage of development.
         ...
20       We believe that iseganan has an attractive profile as an agent for the
         prevention of VAP.
21       ...
         Clinical Status of Iseganan in VAP
22       ...
         ... It is anticipated that results from this trial will be available in the fourth
23       quarter of 2004.

24   (*Id.*, ¶ 106.)  Plaintiffs allege that the above quoted statements were false and misleading

25   because Defendants reviewed blinded data through the CRFs and through IntraBiotic's follow-

26   up queries to the CRFs.  Plaintiffs further allege that Defendants had access to the unblinded

27   interim data since at least April 9, 2004.  (*Id.*, ¶ 107.)  Plaintiffs further allege that the blinded

28   and unblinded data showed that iseganan caused a higher rate of VAP and mortality.  (*Id.*)

United States District Court

For the Northern District of California

**ANALYSIS**

Section 10(b) of the Securities Exchange Act provides, in part, that it is unlawful "to use or employ in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j(b).

Rule 10b-5 makes it unlawful for any person to use interstate commerce:

(a)     To employ any device, scheme, or artifice to defraud;
(b)     To make any untrue statement of material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or;
(c)     To engage in any act, practice, or course of business that operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

To plead a claim under section 10(b) and Rule 10b-5, a plaintiff must allege (1) a misrepresentation or omission, (2) of material fact, (3) made with scienter, (4) on which the plaintiff justifiably relied, (5) that proximately caused the alleged loss. *Binder v. Gillespie*, 184 F.3d 1059, 1063 (9th Cir. 1999). Additionally, as in all actions alleging fraud, a plaintiff must state with particularity the circumstances constituting fraud. *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 193 (9th Cir. 1999); Fed. R. Civ. P. 9(b).

Plaintiffs also claim that the individual defendants are liable pursuant to Section 20(a) of the Securities Exchange Act, which provides for derivative liability for those who control others found to be primarily liable under the provisions of that act. *See In re Ramp Networks, Inc. Sec. Lit.*, 201 F. Supp. 2d 1051, 1063 (N.D. Cal. 2002). Where a plaintiff asserts a Section 20(a) claim based on an underlying violation of section 10(b), the pleading requirements for both violations are the same. *Id.*

**A.     Applicable Pleading Standards.**

**1.     Rule 12(b)(6).**

A motion to dismiss is proper under Rule 12(b)(6) where the pleadings fail to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). A motion to dismiss should

not be granted unless it appears beyond a doubt that a plaintiff can show no set of facts supporting his or her claim.  *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); *see also De La Cruz v. Tormey*, 582 F.2d 45, 48 (9th Cir. 1978).

### 2.    Private Securities Litigation Reform Act.

In order to limit the number of frivolous private securities lawsuits, Congress enacted the PSLRA in December of 1995, and created heightened pleading standards for such lawsuits.  15 U.S.C. § 78u-4(b).  The PSLRA requires that "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1)(B); *see also Employers Teamsters Local Nos. 175 and 505 Pension Trust Fund v. Clorox Co.*, 353 F.3d 1125, 1134 (9th Cir. 2004).  Furthermore, the PSLRA requires that the plaintiff "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2).

The heightened standard set by the PSLRA was intended to put an end to securities fraud lawsuits that plead "fraud by hindsight."  *In re Silicon Graphics, Inc. Sec. Lit.*, 183 F.3d 970, 988 (9th Cir. 1999).  "The PSLRA significantly altered pleading requirements in private securities fraud litigation by requiring that a complaint plead with particularity both falsity *and* scienter."  *In re Vantive Corp. Sec. Lit.*, 283 F.3d 1079, 1084 (9th Cir. 2002) (citing *Ronconi v. Larkin*, 253 F.3d 423, 429 (9th Cir. 2001)) (emphasis added).  "Thus the complaint must allege that the defendant made false or misleading statements either intentionally or with deliberate recklessness or, if the challenged representation is a forward looking statement, with 'actual knowledge ... that the statement was false or misleading.'"  *Id.* at 1085 (citing 15 U.S.C. § 78u-5(c)(1)(B)(i)).  This is often accomplished "by pointing to inconsistent contemporaneous statements or information (such as internal reports) made by or available to the defendants."  *Yourish v. California Amplifier*, 191 F.3d 983, 993 (9th Cir. 1999) (quoting *In re GlenFed Sec. Lit.*, 42 F.3d 1541, 1549 (9th Cir. 1991) (*en banc*)).

Under the PSLRA, a complaint still is construed in the light most favorable to the non-moving party and all material allegations in the complaint are taken to be true. *Silicon Graphics*, 183 F.3d at 983. To determine whether a plaintiff has pled a strong inference of scienter, however, "the court must consider all reasonable inferences to be drawn from the allegations, including inferences unfavorable to the plaintiffs." *Gompper v. VISX, Inc.*, 298 F.3d 893, 897 (9th Cir. 2002). The Court "should consider all the allegations in their entirety, together with any reasonable inferences therefrom, in concluding whether, on balance, the plaintiffs' complaint gives rise to the requisite inference of scienter." *Id.* "Conclusory allegations of law and unwarranted inferences, however, are insufficient to defeat a motion to dismiss." *In re Northpoint Communications Group, Inc. Sec. Lit.* (*Northpoint II*), 221 F. Supp. 2d 1090, 1094 (N.D. Cal. 2002).

Finally, the Court may consider the facts alleged in the complaint, documents attached to the complaint, documents relied upon but not attached to the complaint when the authenticity of those documents is not questioned, and other matters for which the Court can take judicial notice. *Northpoint II*, 221 F. Supp. 2d at 1094; *see also Silicon Graphics*, 183 F.3d at 986.

**B.      Request for Judicial Notice.**

Defendants request that the Court take judicial notice of IntraBiotics' press releases, SEC filings, the Iseganan Report, and excerpts from a Congressional Conference Report, all of which are referenced in the SCAC or are publicly filed documents. Plaintiffs do not dispute the accuracy of the documents attached to the request or that these documents are the types of documents of which this Court properly make take judicial notice. *See, e.g., In re Calpine Corp. Sec. Lit.*, 288 F. Supp. 2d 1054, 1076 (N.D. Cal. 2003) (court "may properly take judicial notice of SEC filings and documents expressly referenced" in a complaint); *see also Plevy v. Haggerty*, 38 F. Supp. 2d 816, 821 (C.D. Cal. 1998). Accordingly, the Court GRANTS Defendants' request.

**C.      Plaintiffs Fail To Plead Sufficient Facts to Demonstrate Falsity.**

The PSLRA requires that Plaintiffs allege with the requisite particularity each statement alleged to be false or misleading, the reason or reasons why the statement was false or

11

misleading, and if those allegations are made on information and belief, all facts on which that belief is formed.  *See* 15 U.S.C. § 78u-4(b)(1)(B); *see also Employers Teamsters Local Nos. 175 and 505 Pension Trust Fund v. Clorox Co.*, 353 F.3d 1125, 1134 (9th Cir. 2004).

As described above, Plaintiffs set forth the statements that they contend are materially false and misleading in paragraphs 72, 77, 84, 87, 98, 101, 103, 106, and 114 of their SCAC.  In essence, Plaintiffs allege that Defendants made two types of material misrepresentations or omissions.  First, Plaintiffs allege that the statements made regarding the Phase II/III trial for VAP and the FDA review process were misleading because they omitted that Defendants violated protocols or FDA guidelines or regulations by having an advisory committee that was "rife with conflict."  Second, Plaintiffs allege that Defendants made misrepresentations regarding the safety of iseganan and the timing of when they anticipated receiving data from the Phase II/III trial for VAP because Defendants had interim results sooner than they revealed and those results showed that iseganan caused a higher rate of VAP and mortality.  Plaintiffs fail to allege sufficient facts to support either type of misrepresentation or omission.

### 1.    Alleged Conflict Ridden Advisory Committee

In September and October of 2003, IntraBiotics made several statements in press releases regarding the Phase II/III trial for VAP and the FDA review process.  (SCAC, ¶¶ 72, 77, 84.)  Plaintiffs contend that such statements were materially false and misleading because "[D]efendants had no intention to comply with the protocol for the trials that they were developing with the FDA to test their sole drug candidate, iseganan, which included FDA regulations and guidelines regarding monitoring the trials and reporting adverse effects of the drug to the FDA, by for example setting up an advisory board that was rife with conflicts."  (*Id.*, ¶¶ 76, 79, 86.)  As support for their allegation that the advisory board was "rife with conflict," Plaintiffs point to the compensation paid to members of IntraBiotics' steering committee. According to Plaintiffs, the steering committee "purportedly advised [D]efendants regarding their research and development programs, the design of their clinical trials, as well as other medical and scientific matters relating to IntraBiotics' VAP trials."  (*Id.*, ¶ 74.)  Between 2002

United States District Court

For the Northern District of California

and 2004, each of the steering committee members received between $7,500 and $30,000 from IntraBiotics. (*Id.*)

To state a 10b-5 claim, Plaintiffs must allege Defendants made an untrue statement of a material fact, or omitted to state a material fact necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading. *See In re Read-Rite Corp.*, 335 F.3d 843, 846 (9th Cir. 2003) (citing 15 U.S.C. § 78u-4(b)(1)). Even if the steering committee was "conflict ridden," it is not clear how such a fact would render the statements alleged in paragraphs 72, 77, or 84 of the SCAC untrue or misleading.

Moreover, Plaintiffs have not alleged sufficient facts that, if true, would demonstrate the steering committee was "rife with conflict" such that there would be "a substantial likelihood that a reasonable investor would have acted differently if the misrepresentation had not been made or the truth had been disclosed." *See Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 946 (9th Cir. 2005) ("a misrepresentation or omission is material if there is a substantial likelihood that a reasonable investor would have acted differently if the misrepresentation had not been made or the truth had been disclosed"). Plaintiffs did not identify in the SCAC, or in their opposition to Defendants' motion to dismiss, any specific protocol, regulation or guideline which prohibits or limits paying some compensation to physicians or scientists who assist or advise companies with testing drugs. At the hearing, the Court provided Plaintiffs an additional opportunity to identify some protocol, regulation or guideline which prohibits IntraBiotics' alleged conduct with respect to compensating members of its steering committee, but Plaintiffs provided none. Nor could Plaintiffs identify any supporting authority for the proposition that failing to disclose paying steering committee members up to $30,000 over a three year period was a material omission. Accordingly, the Court concludes that Plaintiffs failed to allege a material misrepresentation or omission with respect to the compensation paid to the steering committee members.

### 2. Alleged Interim Results

The crux of Plaintiffs' SCAC is that Defendants allegedly received interim results, either blinded results through the CRFs and IntraBiotics' related queries or unblinded data collected by

United States District Court

For the Northern District of California

1    the DMC, before the time when Defendants terminated the Phase II/III trial for VAP and

2    announced the results of the interim analysis in late June 2004.

3              **i.**     **Blinded Results**

4          Plaintiffs allege that, throughout the course of the Phase II/III trial for VAP, the CROs

5    completed CRFs for any adverse result suffered by a patient and that IntraBiotics had access to

6    such CRFs. (SCAC, ¶ 5.) These investigators were directed to fill out CRFs if a patient

7    suffered an adverse event, such as increased illness or death. (*Id*., ¶ 6.) The CRF also contained

8    a section in which the investigator could opine on whether the adverse event was due to the

9    common evolution of the underlying disease or to the drug being tested. (*Id*.)

10        Notably, Plaintiffs do not contend that, at the time the CRFs were prepared, either the

11    CROs or IntraBiotics had access to unblinded data. In other words, when the CROs prepared

12    and when IntraBiotics reviewed the CRFs, neither the CROs nor IntraBiotics were aware of

13    whether the patient who suffered the adverse event was administered iseganan or the placebo.

14    Thus, it is not clear what facts support Plaintiffs' allegations that IntraBiotics could have known

15    whether the adverse event was caused by the underlying disease, iseganan, or some other

16    unrelated reason. Plaintiffs do not allege any specific information revealed by the CRFs. At the

17    hearing, Plaintiffs informed the Court that they had no additional information regarding the

18    CRFs from which they could provide more detailed allegations on what the CRFs conveyed. In

19    light of the fact that the CRFs were prepared based on blind data, the Court concludes that

20    Plaintiffs do not allege any facts to support the inference that CRFs, or the CROs' responses

21    regarding the CRFs, conveyed that iseganan was causing disproportionately more adverse

22    events, such as mortality and increased rates of VAP.

23        Plaintiffs maintain that even though when the CRFs were prepared the results from the

24    Phase II/III for VAP were blinded, IntraBiotics was aware that iseganan caused a higher

25    rate of VAP and mortality. Conceivably, if the overall rates of VAP and mortality were

26    measurably greater than expected, even when the results were blinded, IntraBiotics could have

27    been on notice that there may have been a problem attributable to iseganan. However, here, the

28    Iseganan Report, which is the only information Plaintiffs provided regarding the details of the

1    interim results, shows that the expected rate of VAP among survivors was 18.75 percent and the

2    expected overall mortality rate was 20 percent.  (Woung Decl., Ex. 27.)  Based on the analysis

3    conducted by the DMC, the observed rate of VAP in all patients was actually 18 percent and the

4    mortality rate was actually 19 percent, which is slightly less than was expected for both VAP

5    and mortality.  (*Id*.)  Thus, the overall rates of VAP and mortality were *less* than expected.

6    Accordingly, based on the information before the Court, the Court finds that Plaintiffs have not

7    provided a sufficient basis from which it could be inferred that IntraBiotics was aware, based on

8    the blinded results as reported in the CRFs, that iseganan caused a higher rate of VAP or

9    mortality.

**ii.    Unblinded Results**

11    Plaintiffs contend that by April 9, 2004, at the latest, IntraBiotics had access to the

12    unblinded data collected by the DMC.  In their SCAC, Plaintiffs allege that according to CW2,

13    on February 27, 2004, site investigators were forwarded a document from Joe Parks, a senior

14    program director at IntraBiotics, that 283 patients had been enrolled in the Phase II/III trial for

15    VAP.  Mr. Parks further stated that 300 patients were expected to be enrolled within the next

16    couple of weeks "which would then trigger our interim analysis.  When that occurs, we will

17    need to prepare the CRF data for the [DMC]."  (SCAC, ¶¶ 70, 92.)  Plaintiffs allege the

18    document from Mr. Parks was attached to an email he sent to the CRO responsible for

19    communicating messages from IntraBiotics to the investigators, which was then forwarded to

20    the investigators.  (*Id*., ¶ 9.)  According to the same confidential witness, on March 5, 2004, the

21    site investigators were then forwarded another document from Mr. Parks informing them that

22    310 patients had been enrolled and the data needed to be collected and submitted to the CROs

23    by April 9, 2004.  (*Id*., ¶¶ 9, 93.)  Plaintiffs allege that the confidential witness confirmed that

24    his team provided their data to a CRO before the April 9, 2004, deadline.  (*Id*., ¶ 94.)

25    Even if this confidential witness, who was a clinical investigator who reported to a

26    principal investigator, could confirm that *his* team provided its data to a CRO by the April 9,

27    2004, deadline, Plaintiffs have no other information that indicates when the remaining teams

28    provided their data to the CROs.  Moreover, Plaintiffs have no information that indicates when

United States District Court

For the Northern District of California

15

the CROs provide the data to the DMC, when the DMC conducted and completed its analysis on the interim data, or more importantly, when the DMC provided its analysis to IntraBiotics. Thus, Plaintiffs have not provided sufficient information from which it could be inferred that IntraBiotics knew sooner than June 22, 2004, what the interim results revealed, let alone that IntraBiotics had such information before the alleged misrepresentations were made on February 12, March 4, April 12, April 14, April 22, or May 10, 2004.  (*Id.*, ¶¶ 87, 98, 101, 103, 106, 108, 114.)  At the hearing, Plaintiffs admitted that they could not allege any more detailed information with respect to when IntraBiotics obtained information on the interim results.

Furthermore, the interim results, that Plaintiffs allege IntraBiotics received before it terminated the trial, did not indicate a statistically significant difference in adverse results suffered by patients administered iseganan and the placebo.  (Woung Decl., Ex. 27.)  Courts have recognized that until adverse incidents are statistically significant, reports of adverse incidents may be random and may not establish the requisite nexus between the drug being tested and the adverse events to allege materiality.  *See Oran v. Stafford*, 226 F.3d 275, 284 (3rd Cir. 2000) (holding that withheld adverse reaction reports did not provide statistically significant evidence that the drugs caused heart problems and thus were not material); *In re Carter-Wallace, Inc. Sec. Litig.*, 150 F.3d 153, 157 (2nd Cir. 1998) (holding that "[d]rug companies need not disclose isolated reports of illnesses suffered by users of their drugs until those reports provide statistically significant evidence that the ill effects may be caused by - rather than randomly associated with - use of the drugs and are sufficiently serious and frequent to affect future earnings").

In *Oran*, the company knew in February 1994 that seven patients taking their diet pills in Europe had developed leaky heart valves.  *Oran*, 226 F.3d at 279.  In November 1995, the company knew of at least 31 incidents of heart valve abnormalities in Europe.  *Id.*  During the same time period, the company received hundreds of adverse reaction reports regarding patients who displayed symptoms associated with heart and lung problems.  *Id.*  By July 1997, there were 24 reports of heart-valve abnormalities with patients taking the diet pill at the Mayo Clinic.  *Id.* at 279-80.  On September 12, 1997, the FDA informed the company that a survey showed 92

United States District Court

For the Northern District of California

of 291 users of the diet pill had developed heart-valve abnormalities, and the company announced three days later that it was withdrawing the pill from the market. *Id*. at 280. The Third Circuit concluded that "[b]ecause the link between the [diet pill] and heart-valve disorders was never definitively established during the relative period ..., [the company's] failure to disclose this data" did not render its positive statements regarding the diet pill materially misleading. *Id*. at 284. The court further noted that because the "withheld reports did not provide statistically significant evidence[,]" the data and the adverse reaction reports were not material. *Id*.

In *Carter-Wallace*, the company received a report of a drug-related aplastic-anemia death in January 1994. *In re Carter-Wallace*, 150 F.3d at 155. The company received a report of another such death in March of that year, four more in April and May, and another four in July 1994. *Id*. On August 1, 1994, the company and the FDA issued a letter recommending that most patients be withdrawn from the drug treatment. *Id*. The Second Circuit concluded that the company did not have a duty to disclose the drug-related deaths prior to August 1, 1994, because the company's statements regarding the drug "did not become materially misleading until [the company] had information that [the drug] had caused a statistically significant number of aplastic-anemia deaths and therefore had reason to believe that the commercial viability of [the drug] was threatened." *Id*. at 157. The court reasoned that: "[d]rug companies need not disclose isolated reports of illnesses suffered by users of their drugs until those reports provide statistically significant evidence that the ill effects may be caused by – rather than randomly associated with – use of the drugs and are sufficiently serious and frequent to affect future earnings." *Id*.

While some districts courts have concluded that *Carter-Walace* and *Oran* do not provide a "bright-line pleading standard," *see Siracusano v. Matrixx Initiatives, Inc.*, 2005 WL 3970117, * 6 (D. Az. Dec. 15, 2005), plaintiffs still must allege sufficient facts to demonstrate that adverse medical reports are material. For example, in *In re Bayer AG Sec. Litig.*, 2004 WL 2190357 (S.D.N.Y. Sept. 30, 2004), the court concluded that the adverse event reports were not material giving rise to a duty to disclose until a consensus emerged regarding the data on the

drug.  In that case, on June 27, 1997, the company received a letter from its marketing partner expressing concerns over possible drug interactions with Baycol and that advertising Baycol as "simple and safe" no longer seemed viable.  *Id*. at * 2.  On May 28, 1998, the company disclosed that four patients in the United States developed rhabdomylosis, an acute serious muscle disease, while taking Baycol.  *Id*.  By April 23, 1999, the company received 51 adverse event reports of drug-related rhabdomylosis.  *Id*. at * 3.  In October 1999, the company's senior drug safety officer sent an email reporting that the incidence of myopathy, a disorder of muscle tissue, had increased to 60 percent in patients taking Baycol in tandem with another drug and that there were three more rhabdomylosis cases.  *Id*.  By the end of 1999, the company was "inundat[ed]" with adverse event reports; it received reports of 60 cases of rhabdomylosis in November and December of 1999.  *Id*. at * 4.  On March 10, 2004, a doctor working for the company notified it that adverse event reports disclosed that the risk of rhabdomylosis with Baycol was between five and 67 percent greater than with other similar drugs.  *Id*.  By August 2, 2000, a consensus had emerged among the company's drug safety team and consultants that "Baycol's dangers was 'putting the brand at risk.'"  *Id*.

The court noted that "adverse event reports are random and may not establish a nexus between a drug and the reported illness."  *Id*. at *9.  However, based on the consensus reached in August 2000, the court concluded that, by then, the defendants "viewed the adverse event reports as 'sufficiently serious and frequent to affect future earnings.'"  *Id*. at * 10 (citing *Carter-Wallace*, 150 F.3d at 157.)  Accordingly, the court held that the defendants were not under a duty to disclose adverse event data and other documents prior to August 2000, before such information became material.  *Id*.

Here, even if statistically significant evidence is not required, Plaintiffs have not alleged any information from which the Court may infer that IntraBiotics had an obligation to disclose interim results sooner than when it did.  As discussed above, the CFRs reporting adverse events were based on blinded data and revealed a lower overall percentage of adverse events than had been expected.  Plaintiffs also rely on the Iseganan Report as support for their allegations regarding what Defendants knew when regarding the Phase II/III trial for VAP and the interim

1    results.  However, the Iseganan Report stated that, based on an analysis of 709 patients, there

2    were four percent fewer VAP cases (14 versus 18 percent) and four percent more deaths (22.1

3    percent  (80/362) versus 18.2 percent  (63/347)) in the iseganan group as compared with

4    placebo.  The Iseganan Report expressed the conclusion that neither of these differences was

5    statistically significant. (Woung Decl., Ex. 27.)  The findings set forth in the Iseganan Report

6    were that VAP-free survival also did not significantly differ between the two groups: "The

7    proportion of patients who survived and developed VAP or died within the 14-d treatment

8    period was 34.5% (125/362) and 34.6% (120/347) for iseganan-treated and placebo-treated

9    patients, respectively." (*Id.*)  Thus, the conclusion expressed in the Iseganan Report was that

10    Iseganan was not effective in improving the outcome in patients on prolonged medical

11    ventilation and that "the topical administration of iseganan to the oropharynx of medically

12    ventilated patients did not significantly reduce the incidence of VAP among surviving patients."

13    (*Id.*)

14          The Iseganan Report also notes that based on an analysis of approximately one-third of

15    the patients completing the 21-day study, the DMC recommended stopping the Phase II/III trial

16    for VAP early because of a "higher, *although not statistically significant*, rate of VAP and death

17    in the iseganan arm." (*Id.* emphasis added).)  The report does not disclose, and Plaintiffs

18    conceded at the hearing that they have no information regarding, when the DMC made the

19    determination that the Phase II/III trial for VAP should be terminated based on the data from

20    one-third of the patients or when the DMC informed IntraBiotics of its conclusion.  Moreover,

21    the report does not provide, other than stating that the higher rate was not statistically

22    significant, any indication of how many more patients developed VAP or died, or any

23    conclusion that such increased incidents were "caused by – rather than randomly associated with

24    – use of" iseganan. *See Carter-Wallace*, 150 F.3d at 157.

25          Thus, unlike the situation in *Bayer*, where a consensus had emerged regarding the data

26    on the drug's dangers demonstrating that the defendants viewed the adverse event reports as

27    "sufficiently serious and frequent to affect future earnings," *Bayer*, 2004 WL 2190357 at * 10,

28    here, there is no evidence indicating anyone at the DMC or within IntraBiotics considered

United States District Court

For the Northern District of California

1    iseganan dangerous.  In fact, the DMC concluded that harm from iseganan and continuing the

2    trial was "unlikely."  (Woung Decl., Ex. 27.)  Notably, until a consensus emerged, the district

3    court in *Bayer* did not find the information known by the defendants regarding the drug to be

4    material despite the fact that (1) the company's partner expressed concerns over possible drug

5    interactions and believed it would be wrong to advertise the drug as "simple and safe;" (2) the

6    company received 51 adverse event reports of drug-related rhabdomyolysis and by the end of

7    1999 was "inundat[ed]" with more adverse event reports; and (3) a doctor working for the

8    company notified it that adverse event reports disclosed that the risk of rhabdomyolysis from the

9    drug was between five and 67 percent greater than with other similar drugs.  *Id*. at * 2-10.  The

10   Court concludes that Plaintiffs have not alleged sufficient facts indicating that IntraBiotics had

11   information demonstrating iseganan caused adverse effects that were "sufficiently serious and

12   frequent to affect future earnings."  *Id*. at * 10; *Carter-Wallace*, 150 F.3d at 157.

13         Furthermore, even assuming arguendo that the DMC's analysis of the data from one-

14   third of the patients could be considered material, there is no indication that IntraBiotics was

15   even aware of the DMC's analysis before IntraBiotics terminated the trial, or more importantly,

16   before May 10, 2004, when Plaintiffs contend the last alleged misrepresentation was made.  In

17   light of the fact that Plaintiffs allege the interim data was not even *due* to be sent to the *CROs*

18   until April 9, 2004, and Plaintiffs have no information that indicates that all the investigators

19   complied with the deadline or that the CROs promptly submitted the data to the DMC, Plaintiffs

20   have not alleged sufficient facts to support an inference that IntraBiotics was aware of the

21   DMC's analysis before May 10, 2004.  Accordingly, the Court finds that Plaintiffs failed to

22   sufficiently allege facts to support their belief that IntraBiotics made materially false or

23   misleading statements regarding the safety of iseganan.  *See* 15 U.S.C. § 78u-4(b)(1).[4]

24         The Court already provided Plaintiffs an opportunity to amend their complaint to correct

25   this defect.  At the hearing, Plaintiffs made it clear to this Court that they do not have any more

26   information from which they could allege additional facts demonstrating what IntraBiotics knew

27

28         [4] Because the Court finds that Plaintiffs failed to sufficiently allege any materially
     false or misleading statement or omission, the Court need not address whether Plaintiffs
     sufficiently allege scienter.

United States District Court

For the Northern District of California

1    when regarding the interim results from the Phase II/III trial for VAP.  Thus, it appears that

2    providing Plaintiffs another opportunity to amend their complaint would be futile.  *See Silicon*

3    *Graphics,* 183 F.3d at 991 (denying leave to amend because defects in pleadings could not be

4    cured by amendment); *Klamath-Lake Pharmaceutical Ass'n v. Klamath Med. Serv. Bureau,* 701

5    F.2d 1276, 1293 (9th Cir.1983) (futile amendments should not be permitted).  Therefore, the

6    Court dismisses Plaintiffs' third and fourth claims with prejudice.

7    **E.      Plaintiffs' Section 11 and Section 15 Claims**

8             In the order addressing Plaintiffs' Complaint, the Court concluded that Plaintiffs

9    sufficiently plead their Section 11 and Section 15 claims.  Defendants now move to amend this

10   order and certify it for interlocutory appeal.

11            Section 11 of the Securities Act of 1933 imposes liability for false statements or

12   omissions of material fact made in registration statements.  15 U.S.C. § 77k.  To state a claim

13   under Section 11, a plaintiff must allege: "(1) that the registration statement contained an

14   omission or misrepresentation, and (2) that the omission or misrepresentation was material, that

15   is, it would have misled a reasonable investor about the nature of his or her investment."

16   *Kaplan v. Rose*, 49 F.3d 1363, 1371 (9th Cir.1994).  Section 15 imposes joint and several

17   liability upon every person who controls any person liable under Sections 11.  *See* 15 U.S.C. §

18   77o.

19            Plaintiffs' Section 11 claim is not governed by the heightened pleading standards under

20   the PSLRA.  *Falkowski v. Imation Corp.*, 309 F.3d 1123, 1133 (9th Cir. 2002).  Nevertheless,

21   this claim may still be subject to the heightened pleading requirements of Federal Rule of Civil

22   Procedure 9(b) if it is "grounded in fraud."  *See In re Stac Elec. Sec. Lit.*, 89 F.3d 1399, 1404-

23   1405 (9th Cir. 1996).  A claim is "grounded in fraud" if the plaintiff alleges a unified course of

24   fraudulent conduct and relies entirely on that course of conduct as the basis of his or her claim.

25   *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1104 (9th Cir. 2003); *see also In re Daou*

26   *Systems, Inc. Sec. Litig.*, 411 F.3d 1006 (9th Cir. 2005) (holding that, even in the Section 11

27   context, a plaintiff may be subject to Rule 9(b)'s particularity mandate where the complaint

28   'sounds in fraud').

1    This Court initially found that Plaintiffs' Section 11 claim was not "grounded in fraud"

2    and thus was plead sufficiently pursuant to the liberal pleading requirements of Federal Rule of

3    Civil Procedure 8.  However, upon further consideration, it appears to the Court that Plaintiffs'

4    Section 11 is actually "grounded in fraud" and thus subject to the pleading requirements of

5    Federal Rule of Civil Procedure 9(b).  Although Plaintiffs allege that they do not assert that

6    Defendants named in their Section 11 claim are liable for fraudulent or intentional conduct,

7    (SCAC, ¶ 136), the Ninth Circuit has found that a nominal disclaimer of fraud is unconvincing

8    where the gravamen of the complaint is plainly fraud and no effort is made to show any other

9    basis for the claims.  *In re Stac Elec. Sec. Lit.*, 89 F.3d at 1405 n.2.

10   In fairness to Plaintiffs, the Court will give them an opportunity to respond and brief the

11   issue of whether or not their Section 11 claim must be plead with particularity under Rule 9(b),

12   and under either standard, whether this claim is plead sufficiently.  The Court notes that, even

13   under the liberal pleading standards, a "court need not accept as true an allegation that is

14   contradicted by documents on which the complaint relies."  *In re Bristol-Myers Squibb Sec. Lit.*,

15   312 F. Supp. 2d 549, 555 (S.D.N.Y. 2004); *see also In re Bayer*, 2004 WL 2190357, * 3, * 11

16   (rejecting plaintiffs' allegation that a study showed the drug was unsafe where study concluded

17   drug "had a good tolerability and safety profile" and had "clinical utility ... without treatment-

18   limiting adverse events" despite finding that suggested higher doses of the drug were likely to

19   cause significant cell death).  As discussed above, based on the Iseganan Report on which

20   Plaintiffs rely and which is now before the Court, the Court concludes that Plaintiffs failed to

21   allege a material misstatement or omission.  Although the Court reached this conclusion when

22   addressing the sufficiency of Plaintiff's Section 10(b) claim, materiality is also an essential

23   element of Plaintiffs' Section 11 claim.  *See Kaplan*, 49 F.3d at 1371.  Thus, it appears as

24   though the Court's above conclusions regarding Plaintiffs' failure to adequately plead

25   materiality would be equally applicable to Plaintiffs' Section 11 claim.  If so, the Court would

26   dismiss with prejudice Plaintiffs' Section 11 claim, as well as Plaintiffs' derivative Section 15

27   claim.

28

**United States District Court**

For the Northern District of California

22

Finally, in the supplemental brief addressing Plaintiffs' Section 11 and Section 15 claims, the Court admonishes Plaintiffs to *specifically identify* what statement(s) in the registration statement filed on April 14, 2004 Plaintiffs allege are misrepresentations or what omissions made which statements in the registration statement misleading.

The Court HEREBY RESERVES ruling on Defendants' motion to amend or to certify for interlocutory appeal to provide the parties an opportunity to address these issues with respect to Plaintiffs' Section 11 and Section 15 claims. Plaintiffs may file their supplemental brief, if any, by no later than August 18, 2006. Defendants may file a responsive brief, if any, by no later than September 8, 2006. These supplemental briefs may not exceed fifteen pages.

## CONCLUSION

For the foregoing reasons, the Court GRANTS Defendants' motion to dismiss Plaintiffs' third and fourth claims with prejudice. The Court reserves ruling on Defendants' motion to amend or certify for interlocutory appeal the Court's prior order regarding Plaintiff's first and second claims and directs the parties to file supplemental briefing with respect to this claims in accordance with this Order. If Plaintiffs do not file a supplemental brief, the Court will dismiss their first and second claims with prejudice.

**IT IS SO ORDERED.**

Dated: August 1, 2006

JEFFREY S. WHITE
UNITED STATES DISTRICT JUDGE

United States District Court

For the Northern District of California

23